S<small>WEENEY</small> and K<small>URTZ</small>, JJ., concur.

Review denied at 140 Wn.2d 1013 (2000).

[No. 23415-7-II.   Division Two.   August 27, 1999.]

T<small>HE</small> S<small>TATE OF</small> W<small>ASHINGTON</small>, *Respondent*, v. T<small>IMOTHY</small> M. L<small>ONGSHORE</small>, *Appellant*.

*Stephen Gregory Johnson*, for appellant (appointed counsel for appeal).

*Gary P. Burleson, Prosecuting Attorney*, and *David Brian St. Pierre, Deputy*, for respondent.

CONOLEY, J.* — Timothy Longshore appeals his conviction of second degree theft. He argues that clams he took from a privately-owned contaminated beach had no market value and that clams in a natural bed are ferae naturea,

---

*Judge Karen B. Conoley is serving as a judge pro tempore of the Court of Appeals pursuant to CAR 21(c).

thus not the personal property of the tidelands owner. We affirm.

## FACTS

On October 6, 1997, Timothy Longshore, along with two other men, took 340 pounds of manila clams from private property without permission and sold them to a wholesaler for $1.50 per pound. The clams came from a natural bed that lies within a prohibited zone; commercial shellfishing is not permitted there because of fecal contamination from a nearby sewage plant. Commercial shellfishing is permitted only in areas certified clean by the Department of Health. The purchaser of Longshore's clams was not aware that they were from an uncertified beach.

At trial, both parties presented testimony regarding the market value of uncertified clams. Sergeant Steven De-Miero, a supervisor for the Department of Fish and Wildlife, testified for the State. DeMiero stated that there is a "gray" market for uncertified clams, and the market value of such clams is between $1.15 and $1.50 per pound. Longshore presented one witness, David Robertson, a division manager for a shellfish company. Robertson testified that the wholesale price for fresh, certified manila clams was $2.00 per pound.[1] He stated that his company does not purchase shellfish from uncertified beaches. But he acknowledged the existence of a market for uncertified clams.

At the close of the State's evidence, Longshore moved for a directed verdict, contending that the State failed to prove its prima facie case of theft in the second degree. He argued that contaminated shellfish have no value[2] and that clams in a natural bed are not subject to private possession, thus their removal cannot constitute theft. The court denied the motion.

---

[1] Robertson testified that $2.00 per pound was the market price to a wholesale distributor, who would resell the clams for $2.40 to $2.60 per pound to another wholesaler.

[2] Longshore refers to "contaminated" and "uncertified" clams interchangeably. But there is no evidence that the clams he took were actually contaminated.

The case was submitted to a jury, which returned a guilty verdict. Longshore's motion for arrest of judgment, based on his argument that clams are not the personal property of a private tidelands owner, was also denied. Longshore appeals.

## STANDARD OF REVIEW

■ A directed verdict is appropriate if, when viewing the evidence in the light most favorable to the nonmoving party, the court can say, as a matter of law, that there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. *Hizey v. Carpenter*, 119 Wn.2d 251, 271-72, 830 P.2d 646 (1992) (quoting *Industrial Indem. Co. of the N.W. v. Kallevig*, 114 Wn.2d 907, 915-16, 792 P.2d 520, 7 A.L.R.5TH 1014 (1990)). The trial court accepts as true the nonmoving party's evidence and all favorable inferences arising from it. *Stiley v. Block*, 130 Wn.2d 486, 504, 925 P.2d 194 (1996). The motion must be denied if there is *any* competent evidence or reasonable inference from which reasonable minds might reach conclusions that could sustain a verdict. *Saunders v. Lloyd's of London*, 113 Wn.2d 330, 335, 779 P.2d 249 (1989) (emphasis added). In the instant case, there was testimony that the uncertified clams had a market value.

Under CrR 7.4, a defendant may bring a motion for arrest of judgment for "insufficiency of the proof of a material element of the crime." CrR 7.4. In reviewing a trial court decision denying either a motion for a directed verdict or a motion for arrest of judgment, the appellate court applies the same standard as the trial court: that is, whether there is sufficient evidence that could support a verdict. *Stiley*, 130 Wn.2d at 504; *Hizey*, 119 Wn.2d at 271; *State v. Bourne*, 90 Wn. App. 963, 967-68, 954 P.2d 366 (1998) ("[E]vidence is sufficient if any rational trier of fact viewing it most favorably to the State could have found the essential elements of the charged crime beyond a reasonable doubt.").

The elements of second degree theft are: "[t]o wrong-

fully obtain or exert unauthorized control over the property or services of another . . . with intent to deprive him of such property or services[,]" where such property or services "exceed(s) two hundred and fifty dollars in value[.]" RCW 9A.56.020(1)(a), .040(1)(a).

## ANALYSIS
### *Fair Market Value*

■ Longshore argues that his conviction must be reversed because the evidence is insufficient to support the jury's finding that the clams he took are worth more than $250. Evidence is sufficient if, after viewing it in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *State v. Green*, 94 Wn.2d 216, 221, 616 P.2d 628 (1980). A claim of insufficiency admits the truth of the State's evidence and all inferences that reasonably can be drawn therefrom. *State v. Salinas*, 119 Wn.2d 192, 201, 829 P.2d 1068 (1992).

■ The value of stolen property is: "the market value of the property or services at the time and in the approximate area of the criminal act." RCW 9A.56.010(17)(a); *State v. Kleist*, 126 Wn.2d 432, 434, 895 P.2d 398 (1995). "Market value" is the price which a well-informed buyer would pay to a well-informed seller, where neither is obligated to enter into the transaction. *Kleist*, 126 Wn.2d at 435.

Longshore argues that because the wholesaler to whom he sold the clams was unaware they were from an uncertified beach, the $1.50 price per pound that the wholesaler paid cannot be used as evidence of market value. He contends that the testimony of Floyd Irvin,[3] who stated that he would not buy contaminated clams at any price, established their fair market value at zero.[4] But "market value" is determined by an objective standard; it is not

---

[3]An accomplice who testified against Longshore.

[4]Irvin's testimony was in response to a hypothetical question; it was not founded upon expertise or knowledge of wholesale market values for shellfish.

based upon the value of the goods to any particular person. *Kleist*, 126 Wn.2d at 438 (citing *State v. Clark*, 13 Wn. App. 782, 788, 537 P.2d 820 (1975) (quoting 52A C.J.S. *Larceny* § 118, at 618-19 (1968)). DeMiero estimated the value of uncertified clams to be $1.15 to $1.50 per pound, a price substantially lower than the market value of certified clams as established by Longshore's witness. Moreover, Longshore's witness testified that uncertified clams have a market value.[5] This evidence was sufficient to enable the jury to find that the value of the clams taken by Longshore was greater than $250.

### Ownership of a Natural Bed of Clams

■ Longshore next contends that he should not have been convicted of theft because the clams he took were not "the property of . . . another."[6] To constitute the property of another, an item must be one in which another person has an interest, and the defendant may not lawfully exert control over the item absent the permission of that other person. *State v. Pike*, 118 Wn.2d 585, 590, 826 P.2d 152 (citing *State v. Latham*, 35 Wn. App. 862, 864-65, 670 P.2d 689 (1983)), *aff'd by Clark v. Luepke*, 118 Wn.2d 577, 826 P.2d 147 (1992); *State v. Jacobson*, 74 Wn. App. 715, 719, 876 P.2d 916 (1994) (citing *State v. Joy*, 121 Wn.2d 333, 340-41, 851 P.2d 654 (1993)), *review denied*, 125 Wn.2d 1016 (1995). Even where a person possesses legal title to an item, theft can occur if that person takes the item from another who has a superior possessory interest.[7] *Pike*, 118 Wn.2d at 590.

Longshore relies on the public trust doctrine and the

---

[5]When asked whether there were a market value for contaminated clams, Robertson replied: "I'm sure there is. There's a lot of them that are sold. I don't know what the rate is."

[6]The elements of theft are: "[t]o wrongfully obtain or exert unauthorized control over the property or services of another . . . with intent to deprive him of such property or services[.]" RCW 9A.56.020(1)(a).

[7]The proposition that Longshore's conviction could be sustained on the ground that Mackelwich had some possessory interest in the clams lesser than ownership is not supported by any of the cases discussing title to clams. Either they belong to the property owner, or they belong to the State and can be taken by the public only as permitted by state regulation.

common law regarding animals ferae naturea in arguing that the ownership interests of a private tidelands owner do not include ownership of a natural bed of clams. Neither theory supports his position.

### Animals Ferae Naturea

■ Title in animals ferae naturea (wild game) belongs to the State, and the State holds this title in trust for the use and benefit of its people. *Graves v. Dunlap*, 87 Wash. 648, 651, 152 P. 532 (1915). However, if animals ferae naturea are confined and controlled by someone, he or she may obtain a property right in them so that their felonious taking will be larceny. *Id.* at 652-53. Longshore relies on this distinction to argue that, while a cultivated bed of clams may constitute personal property, a natural bed of clams cannot.

Longshore's argument is not supported by Washington law. He is correct that clams found on tidelands belonging to the State may be taken, in the absence of a statutory prohibition, by anyone who finds them. *State v. Johnson*, 80 Wash. 522, 524, 141 P. 1040 (1914). But when the State vests title to tidelands in a private landowner, "such investiture must carry with it the right to exercise dominion and ownership over . . . things so closely related to the soil as clams." *Sequim Bay Canning Co. v. Bugge*, 49 Wash. 127, 131, 94 P. 922 (1908); *see also State v. Van Vlack*, 101 Wash. 503, 505, 172 P. 563 (1918) (clams, because of their fixed habitation in the soil, may become the subject of private ownership and differ from fish, game birds, and game animals); *see also* RCW 77.08.010(16) (excluding shellfish from the definition of wildlife).

The only limitation on a private-tidelands-owner's "dominion" over his or her clams is the legislature's right to regulate clam-gathering pursuant to its police powers. *See Wiegardt v. Brennan*, 192 Wash. 529, 533-34, 73 P.2d 1330 (1937) (although clams are the subject of private ownership when title to the clam beds passes from the State, the State may, pursuant to its police powers, regulate

their taking in the interests of conserving and increasing a valuable food supply).

## The Public Trust Doctrine

■ The State of Washington has, since statehood, had the power to sell and convey title to state tidelands. *See Caminiti v. Boyle*, 107 Wn.2d 662, 668, 732 P.2d 989 (1987), *cert. denied*, 484 U.S. 1008 (1988). Title conveyed by the State is absolute. *Id.* at 668. Pursuant to the public trust doctrine, however, the public retains an interest in navigable waterways and the lands under them. *Id.* at 668-69. This interest includes the right of navigation along with the incidental rights of fishing, boating, swimming, and other related activities. *Id.* at 669. But, as stated by the Supreme Court in *Sequim Bay*, "[e]ven if clams should be classified as fish under the term of 'shell fish,' . . . still they cannot be taken by the use of any methods exercised in the prosecution of the common right of fishing in the waters." *Sequim Bay*, 49 Wash. at 131. Under Washington law, clams "belong with the land."[8] *Id.* Therefore, in Washington, the public trust doctrine does not encompass the right to gather clams on private property.

Based on the foregoing, we affirm Longshore's conviction.

ARMSTRONG, A.C.J., and SEINFELD, J., concur.

Review granted at 139 Wn.2d 1015 (2000).

---

[8]Longshore cites two 19th Century U.S. Supreme Court cases that mention shellfishing as part of the public trust doctrine. *See The Volant*, 59 U.S. (18 How.) 71, 74-75, 15 L. Ed. 269 (1855); *Martin v. Waddell's Lessee*, 41 U.S. (16 Pet.) 367, 411, 10 L. Ed. 997 (1842). "But it has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." *Phillips Petroleum Co. v. Mississippi*, 484 U.S. 469, 475, 108 S. Ct. 791, 98 L. Ed. 2d 877 (1998) (citing *Shively v. Bowlby*, 152 U.S. 1, 26, 14 S. Ct. 548, 557, 38 L. Ed. 331 (1894)).