5 P.3d 1256 (2000)
141 Wash.2d 414
STATE of Washington, Respondent,
v.
Timothy LONGSHORE, Petitioner.
No. 68531-2.
Supreme Court of Washington, En Banc.
Argued June 1, 2000.
Decided August 17, 2000.
*1257 Christine Gregoire, Atty. Gen., Jay Douglas Geck, Asst., Olympia, for Amicus Curiae on Behalf of Attorney General.
Settle & Johnson, Robert William Johnson, Shelton, for Amicus Curiae on Behalf of Pacific Coast Shellfish Growers Assoc.
John B. Arum, Seattle, for Amicus Curiae on Behalf of Washington Environmental Council.
Johnson & Miller, Stephen Gregory Johnson, Tacoma, for Petitioner.
Gary P. Burleson, Prosecuting Attorney, David B. St. Pierre, Deputy Prosecuting Attorney, Shelton, for Respondent.
SANDERS, J.
Digging 340 pounds of clams on privately owned tidelands earned Timothy Longshore a conviction for second degree theft. The questions are twofold: do clams in naturally occurring beds on privately owned tidelands constitute "property of another" within the meaning of the theft statutes, and, if so, did the state prove the clams Longshore took had a market value of more than $250. We answer both questions in the affirmative, and affirm.

FACTS
William Mackelwich owns a waterfront lot on Hammersley Inlet in Mason County. There are naturally occurring clam beds in *1258 the tidelands along the inlet, but Mackelwich has not seeded or staked any of these beds.
Early in the morning of October 6, 1997, one of Mackelwich's neighbors, Ms. Nancy Nelson, contacted Sergeant Steven DeMiero of the Washington State Department of Fish and Wildlife to report suspected illegal clam harvesting. Around 4:30 a.m., Nelson observed two or three individuals walk up from the beach toward a cul-de-sac and depart in a small silver pickup truck. Shortly thereafter a tan sedan returned with two individuals who picked up several bags of clams hidden in the bushes, placed them in the trunk, and departed.[1] When Nelson called Sergeant DeMiero, DeMiero contacted fellow fish and wildlife officer Matthew Nixon to investigate the allegations of illegal clam harvesting. DeMiero positioned himself in the general area to intercept the suspects. Observing a vehicle matching the description given by Nelson, DeMiero gave chase and stopped the sedan, assisted by Nixon. The officers handcuffed and identified the suspects. DeMiero recognized one of the passengers as Longshore. The driver was Floyd Irvin. Obtaining Irvin's permission to search the trunk of the vehicle, DeMiero discovered over 300 pounds of sacked clams. Nixon also observed a large quantity of certification tags[2] in the trunk.
Seizing the clams, the officers placed them in Nixon's pickup. Eventually Nixon photographed, weighed, and destroyed the seized clams because they came from an uncertified beach, one within a prohibited shellfish harvesting zone due to potential fecal coliform bacteria contamination.
On October 8, 1997, the state charged Longshore with one count of second degree theft. A jury trial commenced on April 6, 1998. At trial Mackelwich testified he did not grant permission to any person to harvest clams from his beach.
Under a grant of transactional immunity, Irvin, the driver of the vehicle, testified on behalf of the state. Irvin testified that on October 6, 1997, he, Longshore, and Ken Burnett unlawfully harvested clams from Mackelwich's beach property. Irvin stated it was their intent to harvest and sell the clams.
To establish the value of the clams Longshore harvested, Irvin testified that the previous evening, October 5, 1997, he and Longshore illicitly harvested clams from Mackelwich's property and sold them to Skipper John's in Hoodsport for $1.50 per pound.[3] Irvin also stated Skipper John's was not informed the clams originated from an uncertified beach. Sergeant DeMiero testified there exists a "gray" market for clams taken from uncertified beaches, and explained the market value for uncertified clams was between $1.15 and $1.50 per pound in October 1997. Similarly, David Robertson, the intertidal division manager for a commercial shellfish company, explained the market value of certified clams was about $2.00 per pound whereas the price for uncertified clams was about $1.50 per pound.
After the state rested its case, the defense moved for a directed verdict, arguing the state failed to prove a prima facie case of second degree theft. Longshore argued uncertified clams have no fair market value in an informed arm's length transaction. He also argued he could not have taken the property of Mackelwich as a matter of law because clams in a natural bed are animals "ferae naturae," and therefore not the property of any person until reduced to possession.
The trial court denied Longshore's motion for a directed verdict, giving three alternative justifications. First, the court reasoned the state's original transfer of title to the tidelands to Mackelwich's predecessor did *1259 not expressly reserve to the general public an ownership of natural beds of clams. The court also reasoned the Washington Legislature changed the common law rule of animals ferae naturae when it excluded "shellfish" from the definition of "wildlife" in RCW 77.08.010(16). Finally, the court ruled even if shellfish constitute animals ferae naturae, due to their sedentary nature shellfish constitute personal property of a landowner.
The case was submitted to the jury, which found Longshore guilty of second degree theft. Before sentencing, Longshore moved to arrest the judgment, again arguing clams in natural beds were animals ferae naturae and could not be the subject of theft. But the trial court denied Longshore's motion.
Longshore appealed to the Court of Appeals, Division Two. By published opinion the Court of Appeals affirmed, holding when the state vests title to tidelands in a private landowner, such investiture carries with it the right to exercise dominion and ownership "`over ... things so closely related to the soil as clams.'" State v. Longshore, 97 Wash.App. 144, 150, 982 P.2d 1191 (1999) (quoting Sequim Bay Canning Co. v. Bugge, 49 Wash. 127, 131, 94 P. 922 (1908)). The appellate court also held the state presented sufficient evidence to establish the value of the clams taken by Longshore was greater than $250. We granted Longshore's petition for review. State v. Longshore, 139 Wash.2d 1015, 994 P.2d 849 (2000).

ANALYSIS
I. Standard of Review
Review of a trial court decision denying either a motion for directed verdict or a motion for arrest of judgment requires the appellate court to engage in the same inquiry as the trial court.
A directed verdict is appropriate if, after viewing the material evidence in the light most favorable to the nonmoving party, the court determines there is no substantial evidence or reasonable inference to sustain a verdict for the nonmoving party. Hizey v. Carpenter, 119 Wash.2d 251, 271-72, 830 P.2d 646 (1992).
Criminal Rule 7.4 provides a defendant may bring a motion for arrest of judgment for "insufficiency of the proof of a material element of the crime." CrR 7.4(a). The evidence presented in a criminal trial is legally sufficient to support a guilty verdict if any rational trier of fact, viewing the evidence in a light most favorable to the state, could find the essential elements of the charged crime beyond a reasonable doubt. State v. Bourne, 90 Wash.App. 963, 967-68, 954 P.2d 366 (1998).
II. "Property of Another"
Longshore contends he should not have been convicted of theft because clams in naturally occurring beds are not the personal property of any individual until reduced to actual possession.[4] But the Court of Appeals held while this is true as to state-owned tidelands, once tidelands are sold to an individual, title to the clams passes to the private property owner. Longshore, 97 Wash.App. at 150-51, 982 P.2d 1191. We agree.
To convict Longshore of theft the state was required to prove he took the property or services of another. RCW 9A.56.040(1)(a). "Property of another" implicates the definition of "owner" provided by RCW 9A.56.010(10): "`a person, other than the actor, who has possession of or any other interest in the property or services involved, and without whose consent the actor has no authority to exert control over the property or services.'" State v. Pike, 118 Wash.2d 585, 590, 826 P.2d 152 (1992) (quoting RCW 9A.56.010(8)).
Although Longshore concedes Mackelwich is the owner of the tidelands from which he harvested the clams, he nevertheless contends shellfish in naturally occurring beds on private property cannot be the property of another. Longshore relies on the common law regarding animals ferae naturae and the public trust doctrine to argue the ownership *1260 interests of a private tidelands owner do not include natural beds of clams.
A. Animals Ferae Naturae
Longshore contends clams in naturally occurring beds are animals ferae naturae and therefore constitute property of the general public until reduced to possession and confined by an owner of private tidelands. But the law of our state does not support Longshore's argument.
The general rule is clams and oysters cannot be the subject of theft or larceny unless artificially planted or cultivated in the beds from which they were taken:
The difference between the locomotive powers of swimming fish and shellfish, such as oysters and clams, justifies the law in making a distinction as to their ownership. In their natural state, clams and oysters are classified as ferae naturae, and their ownership is vested in the state in its sovereign capacity, but where planted where they do not naturally grow, in locations marked by posts or otherwise, they are classified as domestic animals and are the subjects of private ownership, although their owner has no greater actual possession than is evidenced by their planting and staking. In the latter case, they may be the subject of larceny, and if one injures or converts such shellfish, he is liable to respond in damages.
35 Am.Jur.2d Fish and Game § 5, at 649 (1967) (footnotes omitted). However Washington common law does not adhere to this general rule, instead holding naturally occurring clams on private tidelands are the exclusive property of the tideland owner.
Our earliest decision on point is Sequim Bay Canning Co. v. Bugge, 49 Wash. 127, 94 P. 922 (1908). There, the Sequim Bay Canning Company leased tidelands from the state for the purpose of cultivating and harvesting clams. To increase the productiveness of the naturally occurring clam beds, the company periodically planted Eastern clams. Sequim Bay, 49 Wash. at 129, 94 P. 922. Sequim Bay sought an injunction to prevent repeated trespassing by employees of a competing clam company. Making no distinction between naturally occurring and planted clams, the court held sedentary shell-fish constitute part of the real property and are subject to the ownership and control of the property owner or lessee:
Clams ordinarily live in the soil under the waters, and not within the waters.... They therefore, in a very material sense, belong with the land. When taken they must be wrenched from their beds, made well down in the soil itself. It must follow therefore that, if the state has authority to invest one with the private ownership of the tide lands, such investiture must carry with it the right to exercise dominion and ownership over what is upon the land, and especially over things so closely related to the soil as clams.
Sequim Bay, 49 Wash. at 131, 94 P. 922. Reasoning Sequim Bay was entitled to the exclusive possession and control of the leased property and the clams therein, we held the company had stated grounds for injunctive relief.
In State v. Van Vlack, 101 Wash. 503, 172 P. 563 (1918), a case involving privately owned tidelands, this court reaffirmed and further clarified Sequim Bay. After Harry Van Vlack was convicted of unlawfully possessing clams harvested during the closed season, he challenged the application of the law to him because the clams were taken by the private owner of the tidelands.[5] We observed:
At the outset it may be conceded that, because of the peculiar characteristics of the clamits fixed habitation when imbedded in the soilclam beds may become the subject of private ownership which passes to the grantee by a conveyance from the state of tide lands in which the beds are located. Such is the effect of the decisions of this court in Sequim Bay Canning Co. v. Bugge ... and Palmer v. Peterson, 56 *1261 Wash. 74, 105 P. 179 [(1909)]. In this respect clams differ from fish, game birds and game animals in their wild or natural state.
Van Vlack, 101 Wash. at 505-06, 172 P. 563. Although the statute restricted the rights of the landowner in the use and enjoyment of his property, the court concluded it was nevertheless a valid exercise of the state's police power:
Let it be remembered that property in clams is not the result of human effort or industry; such property is acquired by the uncontrolled forces of nature. It cannot be said, therefore, to be unreasonable to so regulate the use and enjoyment of this manna-like possession by a private owner as to conserve the interest, not only of the public, but of the private owner as well.
Id. at 509, 172 P. 563.
In Wiegardt v. Brennan, 192 Wash. 529, 73 P.2d 1330 (1937), a private tideland owner sought an injunction preventing the state director of fisheries from enforcing provisions of a statute establishing a closed season within which harvesting razor clams for commercial purposes was unlawful. The court held Van Vlack, 101 Wash. 503, 172 P. 563, controlled:
It is true that clams grown on beds in private ownership are the property of the owner; yet, as was said in State v. Van Vlack, supra, it is to be remembered that the property in clams is not the result of human effort or industry, but of uncontrollable forces of nature.
Wiegardt, 192 Wash. at 537, 73 P.2d 1330. Accordingly, when an individual privately owns tidelands, he or she also owns any naturally occurring clams imbedded in the soil.
Longshore erroneously contends State v. Johnson, 80 Wash. 522, 141 P. 1040 (1914), stands for the proposition "[s]hellfish in a natural bed retain their nature as being in a state of nature and therefore wild." Br. of Appellant Longshore at 21. But in Johnson we held larceny charges could not be sustained against an individual who took oysters from their natural beds in the state's reserve oyster lands at a time prohibited by statute for such taking.
Unquestionably, we think, oysters, in common with other shell-fish, found on the tide lands belonging to the state, are so far wild by nature that any one finding them may, in the absence of a statute prohibiting the act, take them and convert them to his own use without violating any of the general criminal statutes of the state; and we think, also, that the statutes creating the oyster reserve lands did not, by the mere act of declaring that such lands were reserve oyster lands, change the rule.
Johnson, 80 Wash. at 524, 141 P. 1040 (emphasis added).[6] Although Johnson clearly holds the taking of shellfish from public tidelands does not constitute larceny,[7] the opinion does not disturb the holdings of Sequim Bay, Van Vlack, and Wiegardt, which affirm ownership of private tidelands invests one with ownership of natural beds of sedentary shellfish.
In apparent recognition of Washington common law, the Legislature has specifically exempted shellfish from wildlife designation. RCW 77.12.010 states "[w]ildlife is the property of the state. The department shall preserve, protect, and perpetuate wildlife." However, RCW 77.08.010(16) exempts shell-fish from this designation:
"Wildlife" means all species of the animal kingdom whose members exist in Washington in a wild state. This includes but is *1262 not limited to mammals, birds, reptiles, amphibians, fish, and invertebrates. The term "wildlife" does not include feral domestic mammals, the family Muridae of the order Rodentia (old world rats and mice), or those fish, shellfish, and marine invertebrates classified as food fish or shellfish by the director....
(Emphasis added.) Thus, this statute further undercuts Longshore's contention that clams are animals ferae naturae and thus constitute property of the general public in Washington.
The United States Supreme Court has also rejected the argument that naturally occurring shellfish on private property constitute animals ferae naturae. In McKee v. Gratz, 260 U.S. 127, 43 S.Ct. 16, 67 L.Ed. 167 (1922), the Court observed:
[T]here is a plain distinction between [mussels] and game birds or freely moving fish, that may shift to another jurisdiction without regard to the will of land owner or State.... On the other hand it seems not unreasonable to say that mussels having a practically fixed habitat and little ability to move are as truly in the possession of the owner of the land in which they are sunk as would be a prehistoric boat discovered under ground or unknown property at the bottom of a canal.
Id. at 135, 43 S.Ct. 16 (citations omitted). Although the Court did not hold shellfish constitute part of the realty for purposes of the state statute at issue, id., the Court nevertheless concluded possession of mussels via ownership of the real property entitled the owner to damages for conversion by a trespasser. "We are slow to believe that there were public rights extending to the removal of mussels against the land owner's will." Id. at 136, 43 S.Ct. 16.
Therefore naturally occurring shellfish are the property of the land owner. Shellfish are not animals ferae naturae. Although Washington precedent suggests sedentary shellfish constitute part of the realty, Sequim Bay, 49 Wash. at 131, 94 P. 922, we need not decide whether naturally occurring shellfish constitute real or personal property to affirm Longshore's conviction.[8] As we have previously held a private property owner has the right to exercise dominion and ownership over shellfish upon his land, Sequim Bay, 49 Wash. at 131, 94 P. 922, removing shellfish from the land of a private property owner clearly constitutes deprivation of "a legally recognized interest in the property." RCW 9A.56.010(6)(a).
We therefore reject Longshore's contention that naturally occurring clams on private property are animals ferae naturae and reaffirm the proposition that shellfish embedded upon private property are property subject to the ownership, possession, and control of the owner of the beach.
B. Public Trust Doctrine
Longshore also contends naturally occurring shellfish on private tidelands are "public trust resources" and that such resources cannot be conveyed into private ownership. Specifically, Longshore argues "the judicial determination that shellfish are part of the land constitutes an alienation of the jus publicum interest in animals ferae naturae in violation of the public trust doctrine." Mot. for Discretionary Review at 12. We disagree.
The state's ownership of tidelands and shorelands is comprised of two distinct aspectsthe jus privatum and the jus publicum. Caminiti v. Boyle, 107 Wash.2d 662, 668-69, 732 P.2d 989 (1987). The jus publicum, or public trust doctrine, is the right "`of navigation, together with its incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters.'" Caminiti, 107 Wash.2d at 669, 732 P.2d 989 (quoting Wilbour v. Gallagher, 77 Wash.2d 306, 316, 462 P.2d 232, 40 A.L.R.3d 760 *1263 (1969)). Pursuant to the public trust doctrine the state has the power to dispose of and invest individuals with ownership of tidelands and shorelandssubject only to the paramount public right of navigation and fishery. Caminiti, 107 Wash.2d at 667, 732 P.2d 989.
Longshore contends the jus publicum interest in fishery includes the right to take naturally occurring shellfish on private property, citing three United States Supreme Court cases and two cases from other states that mention shellfishing as an interest protected by the public trust doctrine. See Martin v. Waddell's Lessee, 41 U.S. (16 Pet.) 367, 411, 10 L.Ed. 997 (1842); The Volant, 59 U.S. (18 How.) 71, 74-75, 15 L.Ed. 269 (1855); Phillips Petroleum Co. v. Mississippi, 484 U.S. 469, 476, 484 n. 12, 108 S.Ct. 791, 98 L.Ed.2d 877 (1988); Weston v. Sampson, 62 Mass. (8 Cush.) 347, 353 (1851); Bell v. Town of Wells, 557 A.2d 168, 173 (Me.1989). However, "it has been long established that the individual States have the authority to define the limits of the lands held in public trust and to recognize private rights in such lands as they see fit." Phillips Petroleum Co., 484 U.S. at 475, 108 S.Ct. 791 (citing Shively v. Bowlby, 152 U.S. 1, 26, 14 S.Ct. 548, 38 L.Ed. 331 (1894)). Accordingly, we look solely to Washington law to determine whether the public trust doctrine provides the general public with the right to take naturally occurring shellfish from privately owned tidelands.
The public trust doctrine does not encompass the right to gather naturally occurring clams on private property. In Sequim Bay Canning Co. v. Bugge, 49 Wash. 127, 94 P. 922 (1908), we expressly rejected the contention that fishery rights guaranteed by the public trust doctrine include the right to take clams from private property.
It is contended by respondents that, inasmuch as the lands are at times covered by tidal waters and are uninclosed and vacant, the full common law rights of navigation and fishing remain in the waters above the lands. It is manifest that there can be no navigation except upon the waters, and at such times only as the waters engulf the soil. Ordinary fishing must also be conducted at such times, since the swimming fish can come there and exist at no other time. It is common knowledge, however, that clam digging must be done when the waters have subsided, and that the gathering and taking of clams requires a digging down into the soil, a contact with and disturbance of the land itself. Even if clams should be classified as fish under the term of "shell fish," ... still they cannot be taken by the use of any methods exercised in the prosecution of the common right of fishing in the waters.

Id. at 130-31, 94 P. 922 (emphasis added); see also People v. Johnson, 7 Misc.2d 385, 390, 166 N.Y.S.2d 732 (1957) (because of the characteristics of clams, clamming activity is more closely related to ownership of underlying land than to utilization of public waters). Thus, the common law rights of navigation and fishery do not include the general right to harvest imbedded shellfish on private property.
Although we unquestionably have authority to recognize private rights in lands previously held in public trust, Phillips Petroleum Co., 484 U.S. at 475, 108 S.Ct. 791, the argument that our judicial determination shellfish constitute part of the realty subject to the ownership and control of the property owner constitutes an alienation of the jus publicum is without merit. Under Washington law, clams "belong with the land." Sequim Bay, 49 Wash. at 131, 94 P. 922. The public trust doctrine does not encompass the right to gather clams on private property.[9]
Accordingly, we hold naturally occurring clams on private property are the property of the private tideland owner, and thus the unauthorized taking of such clams constitutes theft under RCW 9A.56.040(1)(a).
III. Valuation
As an alternative basis for relief, Longshore argues his conviction must be reversed *1264 because the evidence presented at trial is insufficient to support the jury's finding that the clams he harvested were worth more than $250. Again we disagree.
An essential element of the charge of second degree theft is that the value of the property taken exceeds $250 but is less than $1,500. RCW 9A.56.040(1)(a). Value is "the market value of the property or services at the time and in the approximate area of the criminal act." RCW 9A.56.010(18)(a). In State v. Kleist, 126 Wash.2d 432, 435, 895 P.2d 398 (1995), we observed: "`"Market value" is defined in this state as the price which a well-informed buyer would pay to a well-informed seller, where neither is obligated to enter into the transaction.'" (quoting State v. Clark, 13 Wash.App. 782, 787, 537 P.2d 820 (1975)).
Longshore argues, "[i]n evaluating whether the evidence presented by the state is sufficient to sustain a conviction of second degree theft, the question is what a private consumer would knowingly pay for contaminated clams." Mot. for Discretionary Review at 7. He reasons "contaminated" clams have no market value because no reasonable, well-informed buyer in an arm's length transaction would purchase them and points to the testimony of Irvin, an accomplice who testified against him, as evidence no reasonable consumer would knowingly purchase "contaminated" clams for consumption. He claims, "The appeals court ignored this testimony, labeling [it] as not objective, the opinion of a particular person, hypothetical, and not based upon `expertise or knowledge of wholesale market values for shellfish.'" Mot. for Discretionary Review at 7-8 (citing Longshore, 97 Wash.App. at 148-49, 982 P.2d 1191).
Irvin did testify, however, that he and Longshore harvested clams from an uncertified beach and sold them for $1.50 per pound the previous evening. Evidence of retail price alone may be sufficient to establish value. Kleist, 126 Wash.2d at 436, 895 P.2d 398 (emphasis added). If value has recently been established at a nearby place, that is proper evidence of value. Clark, 13 Wash.App. at 787-88, 537 P.2d 820.
Longshore continues: "it is irrelevant that $1.50 a pound was the price obtained by the Defendant's alleged `deception.' What is relevant is what an objective, well informed buyer in an arm's length transaction would pay for the product in question." Br. of Appellant Longshore at 32 (citation omitted). But substantial evidence was presented at trial by qualified experts to demonstrate there is, in fact, a quantifiable market value for uncertified clams. For example, Sergeant DeMiero testified there exists a "gray" market for clams taken from uncertified beaches, and explained the market value for uncertified clams was between $1.15 and $1.50 per pound in October 1997. Similarly, David Robertson, the intertidal division manager for a commercial shellfish company, explained the market value of certified clams was about $2.00 per pound whereas the price for uncertified clams was about $1.50 per pound.
At best, from Longshore's point of view, the question is what facts the jury chose to believe regarding value. The state presented sufficient evidence to support the jury's finding that the clams stolen by Longshore were worth more than $250. The jury finds the facts, not this court.

CONCLUSION
In summary, we hold that naturally occurring clams on private property constitute "property of another" within the meaning of Washington's theft statutes. And because the state presented sufficient evidence to establish the valuation of the clams Longshore illegally harvested was greater than $250, we affirm his second degree theft conviction.
GUY, C.J., SMITH, JOHNSON, MADSEN, ALEXANDER, TALMADGE, IRELAND, and BRIDGE, JJ., concur.
NOTES
[1] Because it was fairly dark at the time of this activity, Nelson was unable to identify at trial any of the individuals she witnessed. However, she did identify the vehicle pictured in State's Exhibit 1 as the tan sedan observed collecting the clams.
[2] Certification tags are placed in clam sacks as proof the shellfish are from a beach certified by the Department of Health. The certification tags found in this case were apparently illegal.
[3] Irvin testified Skipper John's paid $322.50 for the uncertified clams harvested on October 5, 1997. Documentation entered as State's Exhibit 12 shows Skipper John's paid Longshore $1.50 per pound for 215 pounds of clams (totaling $322.50) on October 5, 1997.
[4] Although Longshore is a member of a treaty tribe, the parties stipulated he took the clams during a time not designated by the tribe for shellfishing. Presumably because of this stipulation, Longshore has made no argument regarding his tribal shellfishing rights.
[5] The statute at issue made it unlawful for any person to take or dig or to have in his or her possession clams or mussels from any of the tidelands abutting on Puget Sound during proscribed periods for the purpose of canning or selling. Van Vlack, 101 Wash. at 504, 172 P. 563.
[6] Citing statutes creating and regulating oyster reserve lands, the court clarified even oysters upon state tidelands may not be taken with impunity by anyone finding them. Johnson, 80 Wash. at 524, 141 P. 1040.
[7] Amicus curiae Attorney General of Washington notes the Legislature has since made wrongfully taking shellfish from public lands a crime in some circumstances. For example, RCW 79.01.748 provides wrongfully taking timber, minerals, "or any valuable materials" from public lands is considered larceny. And RCW 79.96.130(5) creates a civil remedy for wrongful conversion of shellfish from public lands and provides this remedy is "`supplemental to the state's power to prosecute any person for theft of shellfish, ... or for violation of regulations of the department of fish and wildlife.'" Amicus Curiae Br. of State of Washington at 10 n. 5 (quoting RCW 79.96.130(5)).
[8] We note two additional Washington cases addressing the issue of ownership of artificially planted shellfish. See Edison Oyster Co. v. Pioneer Oyster Co., 22 Wash.2d 616, 157 P.2d 302 (1945); Wiegardt v. State, 27 Wash.2d 1, 175 P.2d 969 (1947). These cases stand for the proposition that one who plants or artificially cultivates shellfish obtains a personal property right in such shellfish. But as both Edison Oyster Co. and Wiegardt involved planted shellfishas opposed to naturally occurring shellfishtheir relevance to the instant case is minimal.
[9] Amicus curiae Washington Environmental Council correctly notes we need not determine whether and under what circumstances the public has a right to enter upon or cross over private tidelands on foot. The elements of the crime of theft, unlike burglary or criminal trespass, do not include unlawful entry upon real property.