ESPLANADE PROPERTIES, LLC, a
Washington limited liability com-
pany, Plaintiff–Appellant,

v.

CITY OF SEATTLE, Defendant–
Appellee.

No. 01–36112.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted June 11, 2002.

Filed Oct. 3, 2002.

Larry Smith, Graham & Dunn, Seattle, WA, for the plaintiff-appellant.

Judith Barbour, Office of the City Attorney, Seattle, WA, for the defendant-appellee.

Before: B. FLETCHER and GOULD, Circuit Judges, and MURGUIA,[1] District Judge.

BETTY B. FLETCHER, Circuit Judge.

Plaintiff Esplanade Properties, LLC ("Esplanade") challenges the legality of

---

1. The Honorable Mary H. Murguia, District Court Judge for the District of Arizona, sitting by designation.

the City of Seattle's ("the City's") denial of its application to develop shoreline property on Elliot Bay in Seattle, Washington. Esplanade contends that the City's action resulted in a complete deprivation of economic use of its property, constituting an inverse condemnation in violation of federal and state constitutional law, and violating both federal and state substantive due process. Specifically, plaintiff appeals three decisions of the district court which, *in toto*, resulted in the dismissal of its claims against the defendant, *to wit*, granting summary judgment to the defendant on plaintiff's takings claim, granting summary judgment to the defendant on plaintiff's federal substantive due process claim, and dismissing plaintiff's state substantive due process claim. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

## I. BACKGROUND

In 1992, Esplanade began a long, and ultimately unsuccessful, process of attempting to secure permission to construct single-family residential housing on and over tidelands located below Magnolia bluff, near both a large city park and a large marina. The property is classified as first class tide-land, and is submerged completely for roughly half of the day, during which time it resembles a large sand bar.

Esplanade purchased the property for $40,000 in 1991, and quickly retained a development team to design and secure

permits for nine waterfront homes, each to be constructed on platforms supported by pilings. In June of 1992, Esplanade applied for building permits, as well as various use permits, variance permits, and special use permits. None of these applications were ever approved.[2]

After reviewing Esplanade's permit applications, the City's Department of Construction and Land Use ("DCLU") identified three significant code compliance issues related to the proposed project: (1) the size of the proposed piers and docks, (2) the design of the causeway access to the houses, and (3) lack of parking on dry land. The City notified Esplanade of its concerns in a Correction Notice. Esplanade responded to the City's concerns, and sought three formal code interpretations from the DCLU, each relating to the issues raised by the City. Central to the ongoing dispute, the City was asked, *inter alia*, to interpret the code with respect to parking.[3] According to the City's interpretation, parking built over water in a single-family zone was prohibited, despite the general requirement that single-family homes be constructed *with* on-site parking. Esplanade appealed this interpretation, which was eventually affirmed by the Washington Court of Appeals on the ground that residential housing was not a water-dependent or water-related use.

---

**2.** Under Washington's Shoreline Management Act ("SMA"), RCW 90.58.010, enacted in 1971, localities are required to develop a set of regulations with respect to their shorelines. Before 1992, under the Seattle Shoreline Master Program ("SSMP"), developed pursuant to the dictates of the SMA, above-water residential construction was seemingly allowed where the lots had less than 30 feet of dry land. Though the Seattle City Council later amended that provision in the SSMP, instead allowing for such use *only* where a lot has *at least* 15 feet of dry land, Esplanade

filed its building permit applications before this change took effect, thus vesting its application to the former provision. *West Main Assoc. v. City of Bellevue*, 106 Wash.2d 47, 720 P.2d 782, 786 (1986) ("A vested right merely establishes the ordinances to which a building permit and subsequent development must comply.").

**3.** SSMP prohibits parking above water unless it is accessory to a water-dependent or water-related use. SMC 23.60.092.

At the end of the appeals process, in November of 1997, Esplanade was informed by the City that it had 60 days to submit formal alterations to its proposed plan, in light of the DCLU's code interpretations, without which the application would be cancelled.[4] Esplanade, instead of altering its parking proposal, simply applied for a variance. Because Esplanade failed to modify its plans with respect to each of the three design concerns raised by the City, on April 13, 1998, the City cancelled Esplanade's application,[5] and later refused to reconsider its unappealable decision.

On June 5, 2000, Esplanade served a letter on the City threatening to make an inverse condemnation claim as a result of the cancellation of its application. Without a response from the City, Esplanade made good on its threat and filed the current action against the City on August 22, 2000.

In its complaint, Esplanade alleges, (1) "inverse condemnation [ ] in violation of the federal and state constitutional provisions prohibiting the taking of private property without just compensation," and (2) "violat[ion][of] plaintiff's right to substantive due process, in violation of the state and federal constitutions." Plaintiff seeks "monetary damages" under 42 U.S.C. § 1983 and RCW 64.40.020.

The district court granted the defendant's motion for partial summary judgment, dismissing Esplanade's federal substantive due process claim based upon our holding in *Armendariz v. Penman*, 75 F.3d 1311 (9th Cir.1996), that federal substantive due process claims are precluded where the alleged violation is addressed by explicit textual provisions of the Constitution, specifically, the Fifth Amendment's "Takings Clause."

The district court, in its Order, did not resolve Esplanade's state substantive due process claim, but requested further briefing from the parties on the question whether the matter should be certified for review by the Washington Supreme Court.

Having received supplemental briefing from the parties, the district court dismissed Esplanade's state substantive due process claim on the ground that Washington state courts had authoritatively held that the Washington Constitution provides no greater substantive due process protection than that afforded by the United States Constitution.

Subsequently, the district court granted the defendant's motion for summary judgment on Esplanade's remaining claim, *to wit*, the City's alleged taking of its property without just compensation, in violation of the Fifth Amendment. The court held that because Esplanade failed to establish that the City's action was the "proximate cause" of its alleged damages, and alternatively, because the "background principles" of Washington state law would have precluded the development, under *Lucas v. South Carolina Coastal Council*, 505 U.S. 1003, 112 S.Ct. 2886, 120 L.Ed.2d 798 (1992), the City was not liable to Esplanade.

Esplanade appealed, challenging each of the district court's three decisions.

---

**4.** After meeting with one of the City's senior land use planners, Esplanade contends that it was given the impression it could satisfy the City's demand to "alter" its application by simply resubmitting the same application along with a request for a parking variance. The City contends that Esplanade had no reason to believe such a submission was adequate, specifically, that *it* never gave Esplanade the impression that it need not address the full panoply of concerns raised by the City with respect to its application.

**5.** Under SMA 23.76.010(F), "An application shall be deemed abandoned and void if the applicant has failed without reasonable justification to supply all required data within sixty (60) days of a written request for it."

## II. STANDARD OF REVIEW

We review *de novo* the district court's grant of summary judgment. *Panatronic USA v. AT & T Corp.*, 287 F.3d 840, 843 (9th Cir.2002).

## III. DISCUSSION

We turn first to Esplanade's federal and state substantive due process claims.

### A. *Federal Substantive Due Process*

■ The Fourteenth Amendment's due process clause provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. In *Armendariz*, 75 F.3d at 1318, we rejected a substantive due process claim brought by plaintiffs (owners of low-income housing in San Bernardino) who alleged, *inter alia*, that the City violated their rights by conducting police sweeps resulting in numerous closures of property owned by the plaintiffs. We held that "plaintiffs' substantive due process claim fails because it is preempted by other constitutional claims under the rule of *Graham v. Connor*, 490 U.S. 386, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989)."[6] *Id.* Because the "Takings Clause 'provides an explicit textual source of constitutional protection' against 'private takings,' the Fifth Amendment (as incorporated by the Fourteenth), 'not the more generalized notion of "substantive due process," must be the guide' in reviewing the plaintiffs' claim of a 'private taking.'" *Armendariz*, 75 F.3d at 1324 (quoting *Graham*, 490 U.S. at 395, 109 S.Ct. 1865).

Esplanade's contention that *Armendariz* is no longer controlling after the Supreme Court's decision in *Eastern Enterprises v. Apfel*, 524 U.S. 498, 118 S.Ct. 2131, 141 L.Ed.2d 451 (1998), is unpersuasive. In that case, a majority of the Court held that the Coal Industry Retiree Health and Benefit Act ("Coal Act"), 26 U.S.C. §§ 9701–9722 (1994 ed. and Supp. II), which established a mechanism for providing health benefits to coal industry retirees and their dependents, was unconstitutional. The plaintiff asserted that the Coal Act violated its substantive due process rights and constituted a taking of property in violation of the Fifth Amendment. *Eastern Enters.*, 524 U.S. at 517, 118 S.Ct. 2131. Justice O'Connor, writing for four Justices, held that the Coal Act violated the Takings Clause, but explicitly declined to address "Eastern's due process claim." *Id.* at 538, 118 S.Ct. 2131. Justice Kennedy, concurring in the judgment, found that the statute should be invalidated based solely upon "essential due process principles, without regard to the Takings Clause of the Fifth Amendment." *Id.* at 539, 118 S.Ct. 2131. The remaining Justices found that neither the Takings Clause nor substantive due process was violated by the Coal Act, and none of those Justices analyzed the question under both the Takings Clause and the Fourteenth Amendment.

*Eastern Enterprises* did nothing to overturn the relevant holding in *Armendariz*. First, of the five Justices constituting the majority, only Justice Kennedy, in concurrence, addressed the due process claim, and he addressed it to the exclusion of the

---

**6.** In *Graham* the Court held that claims of excessive force brought pursuant to 42 U.S.C. § 1983 must be analyzed under the explicit textual sources of constitutional protection found in the Fourth and Eighth Amendments, rather than under the "more subjective standard of substantive due process." *Armendariz*, 75 F.3d at 1319. This rule was reaffirmed in *Albright v. Oliver*, 510 U.S. 266, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994) (Rehnquist, *C.J.*, for plurality), where the Court required the plaintiff to bring his allegation of criminal prosecution without probable cause under the Fourth Amendment, rather than under the more general protections afforded by the Fourteenth Amendment.

takings claim. The four Justices in dissent decided that the plaintiff had neither a takings claim nor a substantive due process claim. For that reason alone there exists no conflict between the reasoning of the Court in *Eastern Enterprises* and our holding in *Armendariz*. Second, it is beyond cavil that, in our cases decided subsequent to *Eastern Enterprises,* Armendariz is treated as controlling precedent. *See, e.g., Weinberg v. Whatcom County,* 241 F.3d 746, 749 n. 1 (9th Cir.2001) (dismissing substantive due process claim where takings claim was also filed, and noting, "Under *Armendariz* [ ], the substantive due process claim is properly subsumed by the takings claim."); *Buckles v. King County,* 191 F.3d 1127, 1137 (9th Cir.1999) (with citation to *Armendariz,* holding that "a plaintiff is precluded from asserting a substantive due process claim instead of, or in addition to, a takings claim.").

Accordingly, we affirm the district court's dismissal of Esplanade's federal substantive due process claim.

### B. *State Substantive Due Process*

 Under Washington law, courts consider six factors in determining the propriety of independent examination of a constitutional claim under the Washington Constitution.[7] *State v. Gunwall,* 106 Wash.2d 54, 720 P.2d 808 (1986). The question presented is whether, in applying those factors, we find it appropriate to conduct an independent analysis of plaintiff's substantive due process claims under Washington law.

We agree with the district court that three recent decisions by Washington courts answer the precise question before us. *State v. Manussier,* 129 Wash.2d 652, 921 P.2d 473, 486 (1996) (Washington Supreme Court declining to make indepen-

dent inquiry into allegation of state substantive due process violation, since, *inter alia,* "[t]he *Gunwall* factors do not favor an independent inquiry under [the Washington Constitution].... [where] [f]actors (1) and (2) indicate co-extensive state and federal protections, inasmuch as the text of Const. art. I, § 3 and the Fifth and Fourteenth Amendments to the Federal Constitution are identical .... [and][f]actors (3) and (4) similarly indicate no broader protection under the state constitution since this court traditionally has practiced great restraint in expanding state due process beyond federal perimeters.") (internal citations and quotation marks omitted); *State v. Burton,* 92 Wash.App. 114, 960 P.2d 480, 482 (1998) (noting that "[t]he Washington Supreme Court has already established that substantive and procedural due process protections provided by [the Washington Constitution] are not broader than those provided by parallel federal constitutional provisions."); *City of Seattle v. McConahy,* 86 Wash.App. 557, 937 P.2d 1133, 1138 (1997) (rejecting argument to "apply a more protective approach [to due process] under the state constitution.... [where] the [Washington] Supreme Court has held that they are to be interpreted the same way."). These decisions make clear that an independent due process analysis is not called for in this case.

We agree with the district court that the Washington Constitution "is no more solicitous of substantive due process concerns than is the federal constitution." Thus, Esplanade's state due process claim fails as well.

### C. *Esplanade's Takings Claim*

The Takings Clause of the Fifth Amendment prohibits the government from taking "private property ... for public use,

---

**7.** Those factors are: (1) the textual language; (2) differences in texts; (3) constitutional and common law history; (4) preexisting state

law; (5) structural differences; and (6) matters of particular state or local concern. *Gunwall,* 720 P.2d at 812–13.

without just compensation." U.S. Const. amend. V. This clause prohibits "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Penn. Cent. Transp. Co. v. City of New York,* 438 U.S. 104, 123, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (quoting *Armstrong v. United States,* 364 U.S. 40, 49, 80 S.Ct. 1563, 4 L.Ed.2d 1554 (1960)). In addition to instances of physical invasion or confiscation, the Supreme Court has long held that "if regulation goes too far it will be recognized as a taking." *Penn. Coal Co. v. Mahon,* 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922). ▪ "Courts have had little success in devising any set formula for determining when government regulation of private property amounts to a regulatory taking," *Tahoe–Sierra Preserv. Council, Inc. v. Tahoe Reg'l Planning Agency,* 216 F.3d 764, 771–72 (9th Cir.2000), *affirmed by Tahoe–Sierra Preserv. Council, Inc. v. Tahoe Reg'l Planning Agency,* 535 U.S. 302, 122 S.Ct. 1465, 152 L.Ed.2d 517 (2002). However, it is clear that under the "categorical" takings doctrine articulated in *Lucas,* "when the owner of real property has been called upon to sacrifice *all* economically beneficial uses in the name of the common good, that is, to leave his property economically idle, he has suffered a taking." *Lucas,* 505 U.S. at 1019, 112 S.Ct. 2886; *see also Palazzolo v. Rhode Island,* 533 U.S. 606, 617, 121 S.Ct. 2448, 150 L.Ed.2d 592 (2001). Where a regulation "denies all economically beneficial or productive use of land," the multi-factor analysis established in *Penn Central* is not applied, and a compensable taking has occurred *unless* "the logically antecedent inquiry into the nature of the owner's estate shows that the proscribed use interests were not part of his title to begin with." *Lucas,* 505 U.S. at 1027, 112 S.Ct. 2886. In other words, for a government entity to avoid liability, any "law or decree" depriving the property

owner of all economically beneficial use of her property "must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." *Id.* at 1029, 112 S.Ct. 2886.

Here, the district court found no taking of plaintiff's property for two reasons. First, the court found that the City's interpretation of the SSMP and its ultimate cancellation of Esplanade's development applications were not the proximate cause of Esplanade's alleged damages. Second, the court found that the background principles of Washington law, specifically the public trust doctrine, burdened plaintiff's property and precluded Esplanade from prevailing in a takings action against the City.

▪ We agree with the district court that under both federal and state law a plaintiff must make a showing of causation between the government action and the alleged deprivation. *See Tahoe–Sierra* (9th Cir.2000), 216 F.3d at 783 & n. 33 (discussing requirement that "plaintiff [in takings claim] must establish both causation-in-fact and proximate causation," and noting that while "true that there is little discussion of a 'causation' requirement in any of the case law involving regulatory takings," despite a passing reference to proximate cause in *Penn Central,* 438 U.S. at 124, 98 S.Ct. 2646, "this is due to nothing more than the fact that, in most regulatory takings cases, there is no doubt whatsoever about whether the government's action was the cause of the alleged taking."); *Ventures N.W. Ltd. P'ship v. State,* 81 Wash.App. 353, 914 P.2d 1180, 1187 (1996) ("An owner claiming loss of the economically viable use of property must show that the challenged government regulation proximately caused the loss of all such use.") (citing *Guimont v. Clarke,* 121 Wash.2d 586, 854 P.2d 1 (1993), *cert. denied,* 510 U.S. 1176, 114 S.Ct. 1216, 127

L.Ed.2d 563 (1994); *Orion Corp. v. State*, 109 Wash.2d 621, 747 P.2d 1062 (1987), *cert. denied*, 486 U.S. 1022, 108 S.Ct. 1996, 100 L.Ed.2d 227 (1988)). However, because we find that the background principles of Washington state law would have precluded development of the proposed project, and therefore that plaintiff's claimed property right never existed, we do not address the question of causation.

### 1. Background Principle: Washington's Public Trust Doctrine

■ As discussed above, a deprivation by the government of all beneficial uses of one's property results in a taking unless, *inter alia*, the "background principles" of state law already serve to deprive the property owner of such uses. *Lucas*, 505 U.S. at 1029, 112 S.Ct. 2886. In *Lucas*, subsequent to plaintiff's purchase of two residential lots of shoreline property, the state of South Carolina passed a statute having the "direct effect of barring petitioner from erecting any permanent structures on his two parcels," rendering them "valueless." 505 U.S. at 1007, 112 S.Ct. 2886. In response, the plaintiff sued, alleging that the government effected a complete deprivation of his property. The Court held that "[a]ny limitation so severe cannot be newly legislated or decreed (without compensation), but must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership," and remanded for a determination of whether such "background principles" would have prevented the proposed use of plaintiff's property. *Id.*, 505 U.S. at 1029, 112 S.Ct. 2886.

■ In this case, the "restrictions that background principles" of Washington law place upon such ownership are found in the public trust doctrine. As the Washington Supreme Court recently explained, the "state's ownership of tidelands and shorelands is comprised of two distinct aspects—the *jus privatum* and the *jus publicum.*" *State v. Longshore*, 141 Wash.2d 414, 5 P.3d 1256, 1262 (2000). Relevant here, the "jus publicum, or public trust doctrine, is the right 'of navigation, together with its incidental rights of fishing, boating, swimming, water skiing, and other related recreational purposes generally regarded as corollary to the right of navigation and the use of public waters.'" *Id.* (quoting *Caminiti v. Boyle*, 107 Wash.2d 662, 732 P.2d 989, 994 (1987) (internal quotation marks and citation omitted)). The "doctrine reserves a public property interest, the jus publicum, in tidelands and the waters flowing over them, despite the sale of these lands into private ownership." *Weden v. San Juan County*, 135 Wash.2d 678, 958 P.2d 273, 283 (1998), (citing Ralph W. Johnson et al., *The Public Trust Doctrine and Coastal Zone Management in Washington State*, 67 Wash. L.Rev. 521, 524 (1992)). "The state can no more convey or give away this *jus publicum* interest than it can 'abdicate its police powers in the administration of government and the preservation of the peace.'" *Caminiti*, 732 P.2d at 994 (quoting *Illinois Cent. R.R. v. Illinois*, 146 U.S. 387, 453, 13 S.Ct. 110, 36 L.Ed. 1018 (1892)). Instead, the state may only divest itself of interests in the state's waters in a manner that does not substantially impair the public interest. *Id.* at 993–95.

■ It is beyond cavil that "a public trust doctrine has always existed in Washington." *Orion Corp.*, 747 P.2d at 1072 (citing *Caminiti*, 732 P.2d at 994). The doctrine is "partially encapsulated in the language of [Washington's] constitution which reserves state ownership in 'the beds and shores of all navigable waters in the state.'" *Rettkowski v. Dep't of Ecology*, 122 Wash.2d 219, 858 P.2d 232, 239 (1993) (quoting Wash. Const. art. 17, § 1). The doctrine is also reflected in Washington's Shoreline Management Act ("SMA"),

adopted in 1971. RCW §§ 90.58.010–.930.[8] Following a long history "favoring the sale of tidelands and shorelands," resulting in the privatization of approximately 60 percent of the tidelands and 30 percent of the shorelands originally owned by the state, *Caminiti*, 732 P.2d at 996, the Washington legislature found that the SMA was necessary because "unrestricted construction on the privately owned or public owned shorelines . . . is not in the best public interest." RCW 90.58.020.

The public trust doctrine, reflected in part in the SMA, unquestionably burdens Esplanade's property.

We agree with the district court that the Washington Supreme Court's decision in *Orion* controls the outcome of this case, and that Washington's public trust doctrine ran with the title to the tideland properties and alone precluded the shoreline residential development proposed by Esplanade.

In *Orion*, the plaintiff corporation, prior to the enactment of the SMA, purchased tideland property in Padilla Bay, the "most diverse, least disturbed, and most biologically productive of all major estuaries on Puget Sound." *Id.*, 747 P.2d at 1065. Orion Corp. proposed dredging and filling of the Bay to create a significant residential community. *Id.* In addressing plaintiff's challenge to subsequent local and state environmental regulations,[9] which it alleged combined to completely deprive it of all economically viable use of its property, the court decided that the tidelands of the

Bay were burdened by the public trust doctrine prior to the enactment of the SMA. *Id.* at 1072. At the time of Orion's purchase, "Orion could make no use of the tidelands which would substantially impair the [public] trust." *Id.* at 1073. Specifically, "Orion never had the right to dredge and fill its tidelands, either for a residential community or farmlands [s]ince a property right must exist before it can be taken, neither the SMA nor the SCSMMP effected a taking . . ." *Id.* (internal quotation marks and citation omitted).

We find that the development proposed by Esplanade would suffer the same fate under the public trust doctrine as the project proposed by Orion Corp.

Esplanade's argument that *Orion* lacks authority, following the Court's decision in *Lucas*, is without merit. *Lucas*, while articulating an expansive concept of what constitutes a regulatory taking, effectively recognized the public trust doctrine:

> Any [regulation that prohibits all economically beneficial use of land] . . . must inhere in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership. A law or decree with such an effect must, in other words, do no more than duplicate the result that could have been achieved in the courts—by adjacent landowners (or other uniquely affected persons) under the State's law of private nuisance, or by the State under its complementary power to abate nui-

---

8. The district court erred in stating that "whatever public trust doctrine existed prior to the enactment of the SMA has been superceded and the SMA is now the declaration of that doctrine." The doctrine itself is reflected *in* the SMA, but is not superseded *by* it, as made clear by the Washington Supreme Court in *Orion*, 747 P.2d at 1073 n. 11 ("We have [ ] observed that trust principles are *reflected* in the SMA's underlying policy . . .") (emphasis added).

9. Plaintiff alleged that the SMA and the Skagit County Shoreline Management Master Program (SCSMMP), adopted and approved by the Washington Department of Ecology and designating plaintiff's property as "aquatic," a designation "that foreclosed dredging and filling the tidelands," combined to take its tideland property without just compensation. *Orion*, 747 P.2d at 1066.

sances that affect the public generally, or otherwise.... The principal "otherwise" that we have in mind is litigation absolving the State (or private parties) of liability for the destruction of "real and personal property, in cases of actual necessity, to prevent the spreading of a fire" or to forestall other grave threats to the lives and property of others.

505 U.S. at 1029 & n. 16, 112 S.Ct. 2886 (internal citations omitted). *Lucas* does nothing to disturb *Orion*'s application of Washington's public trust doctrine.

Esplanade's contention that the proposed development *was* consistent with the SMA at the time his project vested in 1992 is similarly without merit. As the City concedes, at the time of the purchase, the SMA, theoretically, permitted single-family dwellings to be constructed on the property. As the district court noted, however, "[t]here are numerous limitations that the SMA places on developments of shorelines, even if those developments, like Esplanade's, are not categorically prohibited." (citing, *e.g.*, RCW 90.58.020(2)(requiring that shoreline developments "[p]reserve the natural character of the shoreline"), and RCW 90.58.020(4) (requiring that "[p]rojects protect the resources and ecology of the shoreline")). In this case, because Esplanade's tideland property is navigable for the purpose of public recreation (used for fishing and general recreation, including by Tribes), and located just 700 feet from Discovery Park, the development would have interfered with those uses, and thus would have been inconsistent with the public trust doctrine. Therefore, Esplanade's development plans never constituted a legally permissible use.

As the district court correctly noted, "Esplanade ... took the risk," when it purchased this large tract of tidelands in 1991 for only $40,000, "that, despite extensive federal, state, and local regulations restricting shoreline development, it could nonetheless overcome those numerous hurdles to complete its project and realize a substantial return on its limited initial investment. Now, having failed ..., it seeks indemnity from the City." The takings doctrine does not supply plaintiff with such a right to indemnification.

## IV. CONCLUSION

Esplanade's proposal to construct concrete pilings, driveways and houses in the navigable tidelands of Elliot Bay, an area regularly used by the public for various recreational and other activities, was inconsistent with the public trust that the State of Washington is obligated to protect.

For the reasons given, we affirm.

**AFFIRMED.**