[No. 32919-1-II.   Division Two.   May 9, 2006.]

JOANNE MUSSELMAN, *Appellant*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, *Respondent*.

*Jean A. O'Loughlin*, for appellant.

*Robert M. McKenna, Attorney General*, and *Kimberly D. Frinell, Assistant*, for respondent.

¶1 HOUGHTON, J. — The superior court upheld an administrative law judge's (ALJ) decision affirming a notice of financial responsibility (Financial Notice) issued by the Department of Social and Health Services' Office of Financial Recovery (DSHS) for costs associated with Joanne

Musselman's hospitalization at Western State Hospital (Western State). Musselman appeals, arguing that DSHS erroneously interpreted and applied the law when it calculated her financial liability because it exceeds her ability to pay. Alternately, she challenges the validity of the rule DSHS adopted to calculate her liability. We affirm.

## FACTS

¶2 On October 14, 2002, Musselman was involuntarily committed to Western State and has remained there ever since. On October 29, 2002, DSHS sent her a financial questionnaire to determine her eligibility for an adjusted rate for the costs of her hospitalization. She refused to return it.

¶3 Nearly a year later, on September 17, 2003, DSHS served Musselman with a Financial Notice, stating that she would be responsible for the full cost of her care at the rate of $425 per day. Musselman appealed the Financial Notice but withdrew her appeal before the hearing and completed the financial questionnaire.

¶4 On February 24, 2004, DSHS issued a revised Financial Notice based on the information Musselman provided. Her assets included: a monthly income of $800, including $500 from Social Security and a $300 military pension from her ex-husband; $23,000 in her checking and savings accounts, including $17,000 from Social Security and $6,000 from the military pension; and a $59,000 savings bond. In addition, Musselman owned a residence worth approximately $100,000. After subtracting one month's income, DSHS determined that her total available assets were $64,200.00 and that she could pay $184.39 per day. DSHS exempted her home from its calculation.[1]

---

[1] DSHS does not include a patient's residence as an available asset unless, in the opinion of two physicians, the patient has no reasonable possibility of returning home. WAC 388-855-0035(2).

¶5  DSHS calculated the daily rate using a formula, adopted as an administrative rule, that combines Musselman's monthly income and earnings with one-twelfth the value of her other assets (minus specified deductions, exemptions, and allowances) to determine her available monthly assets and multiplies that figure by 0.0328767 to convert the monthly assets into a daily rate. WAC 388-855-0065. A patient is responsible for hospital charges at the daily rate, accrued from the first day of hospitalization to the last. RCW 43.20B.340.

¶6  DSHS periodically recomputes a patient's ability to pay. RCW 43.20B.350. According to DSHS, as patients use available assets to pay for residential care, their assets decrease, as does the assessed daily rate.

¶7  DSHS adopted the formula in order to exercise its statutory discretion to charge patients according to their ability to pay rather than on the actual costs of care. RCW 43.20B.335. Under DSHS's formula, Musselman's total available assets would exhaust in 350 days. But when DSHS issued the Financial Notice, she had been hospitalized for more than 350 days. Thus, the accrued charges exceeded her total available assets.

¶8  Musselman requested an administrative hearing to contest the Financial Notice. She did not contest the calculation of her total available assets, but she argued that DSHS erroneously interpreted and applied the law when it charged her in excess of her ability to pay. She argued that DSHS should have capped her adjusted charges at her total available assets. DSHS took the position that it will not amend the Financial Notice until she acknowledges her debt and begins to pay it down. In the meantime, she has continued to accrue charges at the daily rate of $184.39.

¶9  An ALJ determined that DSHS correctly applied its administrative rules when it calculated her liability. The superior court affirmed the ALJ. Musselman appeals.

## ANALYSIS

### INTERPRETATION AND APPLICATION OF LAW

¶10 Musselman contends that DSHS misapplied and/or misinterpreted the administrative code sections regarding the calculation of liability for hospitalization costs of the mentally ill. She argues that DSHS should cap her hospitalization charges at her total available assets, rather than allowing charges to accrue indefinitely.

¶11 We review final agency orders under the Administrative Procedure Act (APA), chapter 34.05 RCW. *Hertzke v. Dep't of Ret. Sys.*, 104 Wn. App. 920, 926, 18 P.3d 588 (2001). We stand in the shoes of the superior court and apply the APA's standards governing judicial review directly to the agency record. RCW 34.05.570; *Hertzke*, 104 Wn. App. at 926. Under the APA, we may reverse an agency adjudicative decision when the agency erroneously interpreted or applied the law. RCW 34.05.570(3)(d). The party challenging the agency's decision bears the burden of proving the invalidity of the decision. RCW 34.05.570(1)(a). We review findings of fact under the substantial evidence standard and conclusions of law de novo. RCW 34.05.570(3)(e); *Hertzke*, 104 Wn. App. at 926-27. Musselman has not assigned errors to any factual findings, so they are verities on appeal. *Davis v. Dep't of Labor & Indus.*, 94 Wn.2d 119, 123, 615 P.2d 1279 (1980).

¶12 We review an agency's interpretation of statutes and implementing regulations under an error of law standard, in which we may substitute our judgment for the agency's although we give substantial weight to an agency's determination when the subject matter involves the agency's particular area of expertise. *Aponte v. Dep't of Soc. & Health Servs.*, 92 Wn. App. 604, 617, 965 P.2d 626 (1998), *review denied*, 137 Wn.2d 1028 (1999).

¶13 In interpreting administrative rules and regulations, we apply statutory construction canons. *Multicare Med. Ctr. v. Dep't of Soc. & Health Servs.*, 114 Wn.2d 572,

591, 790 P.2d 124 (1990). Thus, where a rule is unambiguous, we may not speculate as to its intent. *Multicare*, 114 Wn.2d at 591. We may not question the wisdom of a particular regulation, we merely determine what it requires. *Multicare*, 114 Wn.2d at 591.

¶14 Washington has a strong public policy to recover the costs of services DSHS provides. RCW 43.20B.020.[2] "Whenever the department of social and health services is authorized by law to collect total or partial reimbursement for the cost of its providing care of or exercising custody over any person, the department shall collect the reimbursement to the extent practical." RCW 43.20B.020. DSHS has broad authority to settle disputed claims and/or write off any debt that is not cost effective to pursue. RCW 43.20B.030(2).[3]

¶15 In the context of services provided to the mentally ill, all persons committed to Western State are liable for reimbursement to DSHS for the costs of their hospitalization. RCW 43.20B.330;[4] *Kolbeson v. Dep't of Soc. & Health Servs.*, 129 Wn. App. 194, 199, 118 P.3d 901 (2005). DSHS may investigate patients' financial resources and determine their ability to pay hospitalization charges. RCW 43.20B-.335. The legislature directed DSHS to adopt a uniform standard for determining a patient's ability to pay. RCW 43-

---

[2] RCW 43.20B.020 states, in part:

The department of social and health services and the department of health are authorized to charge fees for services provided unless otherwise prohibited by law. The fees may be sufficient to cover the full cost of the service provided if practical or may be charged on an ability-to-pay basis if practical. This section does not supersede other statutory authority enabling the assessment of fees by the departments.

[3] RCW 43.20B.030(3) (formerly codified as RCW 43.20B.030(2)) states in part:

The department, at any time, may accept offers of compromise of disputed claims or may grant partial or total write-off of any debt due the department if it is no longer cost-effective to pursue.

[4] RCW 43.20B.330 states in part:

Any person admitted or committed to a state hospital for the mentally ill, and their estates and responsible relatives are liable for reimbursement to the state of the costs of hospitalization and/or outpatient services, as computed by the secretary, or his designee, in accordance with RCW 43.20B.325 [authorizing DSHS to compute the actual costs of hospitalization].

.20B.335. The only express limitation on DSHS's ability to seek reimbursement is that the agency may not collect funds from the criminally insane that would otherwise have compensated the victim. RCW 43.20B.335.

¶16 If DSHS determines that a patient can pay all or part of the hospitalization charges, it issues a Financial Notice stating the amount that such person, or his or her estate, is able to pay. RCW 43.20B.340. A patient may request an administrative hearing to challenge the Financial Notice, in which case its execution is stayed pending the ALJ's final order. Otherwise, the Financial Notice becomes final in 28 days. RCW 43.20B.340.

¶17 Once the Financial Notice is final, DSHS may petition the superior court to enter a judgment in the amount of accrued monthly charges. RCW 43.20B.345. DSHS may also file a lien against all real and personal property owned by the financially responsible party. RCW 43.20B.347.

¶18 DSHS may modify or vacate the Financial Notice at any time if it finds that a person's ability to pay has changed. RCW 43.20B.350. It may either reduce the amount of financial liability or increase it. RCW 43.20B.350. There is no statute of limitations on DSHS's ability to collect hospitalization charges. RCW 43.20B.360. But DSHS may settle for a reduced amount or write off debt "at any time." RCW 43-.20B.030(3) (formerly codified as RCW 43.20B.030(2)).

¶19 DSHS adopted administrative rules regarding hospitalization charges for the mentally ill. Ch. 388-855 WAC. When a patient receives third party benefits, DSHS charges for the actual cost of care. WAC 388-855-0065(1). Otherwise, DSHS charges patients based on their available assets. WAC 388-855-0065(2). DSHS first determines a patient's available assets. WAC 388-855-0035. It then applies a formula to convert the available assets into a monthly cash equivalent, which is then further divided to determine the daily rate of a patient's hospitalization charges. WAC 388-855-0065.

¶20 Available assets include, but are not limited to, "cash, stocks, bonds, savings, security interests, insurance

benefits, guardianship funds, trust funds, governmental benefits, pension benefits and personal property." WAC 388-855-0035(1). The regulations exempt real property if it is the actual residence of the patient or the patient's spouse and/or dependents. But if two doctors believe the patient has no reasonable possibility of returning to her home, the patient's real property becomes an available asset. WAC 388-855-0035(2).

¶21 DSHS divides the available assets by 12 then adds the result to a person's gross monthly earnings and wages to arrive at a gross monthly income. It then subtracts mandatory deductions, including income tax and social security benefits, as well as approved allowances for unusual and exceptional circumstances. DSHS multiplies the adjusted monthly gross income by a factor of 0.0328767 to arrive at a daily rate. WAC 388-855-0065(3). The daily rate is used to calculate a person's adjusted monthly hospitalization charges.

¶22 When a patient, or other financially responsible party, fails to cooperate with DSHS's attempt to evaluate the patient's financial resources, DSHS may assess charges for the actual cost of care. However, "such a finding of liability to pay full hospitalization charges shall in no way diminish the responsible party's right to appeal such a finding of responsibility." WAC 388-855-0095.

■■ ■ ¶23 Musselman argues that DSHS's refusal to cap hospitalization charges at her total available assets contravenes the legislature's clear intent that hospitalization charges be based on "ability to pay." She contends that the Financial Notice is clearly not based on her ability to pay because her accrued charges exceeded her available assets as of the date DSHS issued the Financial Notice.

¶24 Musselman urges us to interpret the administrative rules as permitting DSHS to factor in fixed assets such as her savings bond and checking account balance in calculating the charges for a 12-month period and then to consider those assets no longer available for purposes of determining her ability to pay for hospitalization costs beyond the 12

month period. She claims that in determining later costs of hospitalization, DSHS should look only to ongoing assets, such as earnings and wages, plus any additional fixed assets.

¶25 DSHS counters that it lacks statutory authority to "cap" charges or take into account a person's preexisting debt and that Musselman's proposed interpretation would reward patients who refuse to pay. DSHS maintains that nothing entitles Musselman to a reduced daily rate until she has paid down her debt so that her assets no longer exist.

¶26 Under Musselman's interpretation of the formula, DSHS would issue at least two Financial Notices: the first would apply to the first 12 month period of hospitalization and it would exhaust her fixed assets; the second would apply to her subsequent hospitalization, for which her only available asset (excluding statutory exemptions) would be her husband's $300 per month military pension. In contrast, DSHS issues a single Financial Notice based on both fixed and ongoing assets and periodically revises the Financial Notice as a patient's financial circumstances change. Musselman's piecemeal approach is inconsistent with the statutory scheme.

¶27 The legislature provided that the Financial Notice "*shall cover the period from the date of admission* of such mentally ill person to a state hospital, and *for the costs of hospitalization*, and/or the costs of outpatient services, *accruing thereafter.*" RCW 43.20B.340 (emphasis added). Although DSHS has broad authority to settle debts, the statutory scheme directs it to issue a single Financial Notice which covers the entire period of hospitalization.

¶28 Musselman incorrectly places primary emphasis on DSHS's statutory authority to charge patients according to their "ability to pay." Although the statutory scheme permits DSHS to adjust costs downward when it is not practical to recover the full costs of care, the overarching imperative of the statutory scheme relating to hospitalization costs of the mentally ill is that DSHS attempt to recoup

the costs of care to the maximum extent practical. RCW 43-.20B.020-.030(3) (formerly codified as RCW 43.20B.030(2)), .330. Musselman ignores the statutory language showing the legislature's clear intent to hold patients financially responsible for their hospitalization costs.

¶29 Musselman's interpretation of the statute would reward patients who refuse to accept financial responsibility for their hospitalization costs. That her accrued charges exceeded Musselman's total available assets at the time DSHS issued the amended Financial Notice resulted from her own refusal to cooperate with DSHS or to begin paying down her debt.

¶30 The administrative rule governing the determination of liability (WAC 388-855-0065) contemplates that DSHS will issue a Financial Notice sometime within the first 12 months of a patient's initial hospitalization. In this case, DSHS first sought Musselman's cooperation in assessing her financial resources just 15 days after her commitment to Western State. That DSHS did not issue a Financial Notice until over a year later did not result from any untoward delay by DSHS, but from Musselman's own refusal to respond to DSHS's questionnaire or to pay down the cost of her hospitalization. Musselman cannot now complain that her accrued charges exceed her ability to pay when her own conduct caused the delay in the issuance of the Financial Notice. To hold otherwise would be to reward patients who refuse to cooperate with DSHS and/or refuse to pay anything toward their costs of care, contrary to the legislative intent expressed in RCW 43.20B.020.

¶31 Musselman contends that allowing her accrued charges to exceed her total available assets opens a back door by which DSHS could obtain the value of her home, a result otherwise impermissible absent an opinion by two physicians that there is no reasonable possibility she could return to live there. WAC 388-855-0035(2). She reasons that DSHS can allow a patient's accrued charges to far exceed the patient's total available assets and then file a lien against the patient's home after reducing to

judgment the artificially inflated charges. We reject her argument on the facts presented here.

¶32 We note that a patient may avoid Musselman's hypothetical scenario by paying assessed costs of her hospitalization, thus spending down available assets and becoming eligible for a reduced daily rate. Here, Musselman's own conduct in failing to cooperate with DSHS resulted in the accrual of charges in excess of her total available assets. DSHS acted within its broad grant of statutory authority by refusing to reduce hospitalization charges until she accepts financial responsibility and begins paying toward the costs of care.

¶33 We will not speculate about whether DSHS will attempt to obtain Musselman's home in circumvention of its administrative rule, as she suggests it might. We presume that public officials will act within the limits of their authority and in good faith. *State ex rel. Hodde v. Superior Court*, 40 Wn.2d 502, 515, 244 P.2d 668 (1952). The possible course of DSHS's future collection efforts is not an appropriate issue for our review. DSHS has not yet attempted to execute the Financial Notice, nor could it, because execution of a Financial Notice is stayed pending a final adjudicative order. RCW 43.20B.340. Again, we note that DSHS has broad authority to settle debts "at any time." RCW 43-.20B.030(3) (formerly codified as RCW 43.20B.303(2)). And it may modify or vacate a Financial Notice at the request of a financially responsible party, or on its own motion. RCW 43.20B.350. We believe that it would be premature, contrary to legislative intent, and beyond this court's authority to foreclose DSHS from exercising any of the statutorily authorized means of recovering the costs of Musselman's care.

¶34 We hold that, on these facts, DSHS properly assessed Musselman's daily rate even though her accrued costs exceeded her total available assets on the date DSHS issued the Financial Notice.

¶35 Musselman raises an alternate argument. She challenges the validity of the rule to the extent it permits DSHS to charge her in excess of her ability to pay.

¶36 RCW 34.05.570 governs judicial review of an agency rule, and it permits review in the context of any review proceeding under the APA so long as the agency that promulgated the rule is a party in the action. RCW 34.05-.570(2)(a). A court may declare a rule invalid if it exceeds the agency's statutory authority. RCW 34.05.570(2)(c). Musselman asserts that DSHS exceeded its statutory authority by adopting WAC 388-855-0065 because the rule permits DSHS to hold her financially responsible for charges in excess of her ability to pay, contrary to the legislature's intent in enacting RCW 43.20B.335.

¶37 DSHS argues that it would be inappropriate for us to review the agency's rule for the first time on appeal because the rule-making file is not part of the record on appeal. We agree.

¶38 A petition for review in superior court must identify the relevant agency action at issue. RCW 34-.05.546(4). The agency must then transmit to the court a certified copy of the agency record relating to the matter under review. RCW 34.05.566(1). For rule challenges, the agency's rule-making file serves as the record for judicial review. RCW 34.05.370(4). The rule-making file contains copies of all public notices relating to the rule-making process, transcripts of any public meetings, copies of any comments received, a concise statement explaining the need for the rule, and any other material the agency considered. RCW 34.05.370(2). When Musselman petitioned for review in superior court, she identified the relevant "agency action" as DSHS's decision on her Financial Notice, not its adoption of any administrative rule. Thus, DSHS did not submit its rule-making file to the court; it submitted only the administrative record on her adjudicative proceeding as RCW 34.05.566(1) required.

¶39 The validity of a rule is determined as of the time the agency adopted it. RCW 34.05.562(1), .570(1)(b); *Wash. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 906, 64 P.3d 606 (2003). The rule-making file is necessary for effective judicial review because it contains information the agency considered contemporaneously with the adoption of the rule.

¶40 Musselman's failure to raise the rule challenge in superior court resulted in an inadequate record on appeal. Without the rule-making file, this court cannot meaningfully review the agency's reasoning process for adopting the rule.

¶41 Affirmed.

BRIDGEWATER and PENOYAR, JJ., concur.