# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| CENTER FOR BIOLOGICAL DIVERSITY, | No. 53863-6-II |
| Appellant, | |
| v. | |
| DEPARTMENT OF FISH AND WILDLIFE, and JOE STOHR, in his official capacity as Acting Director, | PUBLISHED OPINION |
| Respondents. | |
| and | |
| WESTERN FORESTRY AND CONSERVATION ASSOCIATION, d/b/a WASHINGTON STATE ANIMAL DAMAGE CONTROL PROGRAM, an Oregon nonprofit corporation, and WASHINGTON FARM FORESTRY ASSOCIATION, | |
| Intervenors. | |

MELNICK, J. — In 2016, the Washington Department of Fish and Wildlife (Department) promulgated a suite of rules to manage human-wildlife conflicts. The agency adopted two rules to implement its black bear timber damage program (the Program). The timber hunt rule, WAC 220-440-210, governs the use of bait and hounds, and the special trapping rule, WAC 220-417-040, governs the use of body-gripping traps.

The Center for Biological Diversity (CBD) appeals the dismissal of its petition for review challenging the rules and specific guidance documents related to the implementation of the

Program.  CBD argues that the Department exceeded its statutory authority by promulgating rules that exceed the narrow exceptions contained in two-voter initiatives[1] that banned the use of bait, hounds, and body-gripping traps.  It also argues that the Department acted arbitrarily and capriciously because it adopted the timber hunt rule without regard to attendant facts and circumstances.  Additionally, CBD challenges several Department policy documents that it contends were required to go through notice and comment rulemaking.  CBD further argues that the trial court erred in denying its motion to supplement the record.  Additionally, CBD has made a motion in this court to supplement the record.

We conclude that the timber hunt rule exceeds the Department's statutory authority because it exceeds the exception set out in the controlling statute for the use of bait and hounds.  However, we conclude that the special trapping rule does not exceed the Department's statutory authority.  We further conclude that the trial court abused its discretion in denying the motion to supplement, but we deny CBD's motion to supplement the appellate record.  We remand CBD's arbitrary and capricious and unlawful rulemaking claims to the trial court to consider.

FACTS

Black bears hibernate in dens during winter, and when they leave their dens in spring, foods with high nutritional value are limited.  Bears will often seek sapwood as a preferred food resource because of its high sugar content.  Bears must peel the bark from the tree to access the sapwood beneath.  Peeling causes scarring or death of the tree.  For commercial purposes, peeling leads to a partial or complete diminishment in the tree's value. Sapwood from trees with high growth rates, typically found on commercial timberlands, contain the highest sugar content; therefore, they are the most vulnerable to depredation.  Commercial forest landowners and managers experiencing

---

[1] Now codified in RCW 77.15.194 and RCW 77.15.245.

timber damage caused by black bears may request a black bear timber damage depredation permit from the Department's black bear timber damage program.

The Department is tasked with managing interactions between humans and wildlife. RCW 77.04.055. Human-wildlife "[c]onflict issues involving public safety with bear . . . are generally resolved by [the Department's] law enforcement [division]. Wildlife conflict issues [involving personal property damage by] deer, elk, turkey, bear (timber damage) and wolf are generally resolved through the Wildlife Program." Administrative Record (AR) at 4090.

Large and small timber operations employ a variety of lethal and non-lethal methods to attempt to prevent bears from peeling trees. Non-lethal methods include erecting fences, using guard animals, and providing food to supplement the bear's diet to replace the need to peel trees. Hunters use various methods to capture and kill bears on timberland, including baiting, hounding, and using body-gripping traps. They also use other hunting methods.

In 1996, Washington voters passed initiative 655, which made it a gross misdemeanor both to attract black bears with bait for the purpose of hunting them and to hunt black bears with dogs. RCW 77.15.245(1).

In 2000, voters passed initiative 713, which made it a gross misdemeanor to capture an animal with certain traps. RCW 77.15.194. "Hounding" which is hunting with dogs, and "baiting" which is using bait to attract animals, are considered by some to be "unfair, unsporting and

inhumane" hunting methods.[2] The use of body-gripping traps is also regarded by some as an inhumane hunting method.[3]

To protect private property, both initiatives contained exceptions to the prohibition of baiting, hounding, and using body-gripping traps. I-655[4] allowed for "the killing of black bear with the aid of bait by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety." RCW 77.15.245(1)(a). It also allowed for "the hunting of black bear . . . with the aid of a dog or dogs by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety. A dog or dogs may be used by the owner or tenant of real property consistent with a permit issued and conditioned by the director." RCW 77.15.245(2)(a).

I-655 also allowed for the "establishment and operation of feeding stations for black bear in order to prevent damage to commercial timberland." RCW 77.15.245(1)(b).

I-713[5] banned the use of specific types of traps, but allowed the Department to issue special permits for such traps "to a person who applies for such a permit in writing, and who establishes

---

[2] "[H]unters often track bears . . . with dogs wearing high-tech tracking equipment. After the dogs chase the animal up a tree, the hunters follow the transmitter signal and shoot the animal at close range. Dogs are sometimes maimed or killed by bears, cougars or bobcats." *State of Washington Voters Pamphlet*, *General Election* 6 (Nov. 6, 1996) (1996 Voters Pamphlet), https://www.sos.wa.gov/_assets/elections/voters'%20pamphlet%201996.pdf.

[3] "Steel-jawed leghold traps and other body-gripping animal traps cause severe injury and suffering to wildlife and pets, causing lacerations, broken bones, and joint dislocations." They are considered inhumane by the American Veterinary Medical Association. *State of Washington Voters Pamphlet*, *General Election* 8 (Nov. 7, 2000) (200 Voters Pamphlet), https://www.sos.wa.gov/_assets/elections/voters'%20pamphlet%202000.pdf.

[4] Codified as RCW 77.15.245.

[5] Codified as RCW 77.15.194.

that there exists on a property an animal problem that has not been and cannot be reasonably abated by the use of nonlethal control tools." RCW 77.15.194(4)(b). A permit may be issued "[u]pon [the Department] making a finding in writing that the animal problem has not been and cannot be reasonably abated by nonlethal control tools or if the tools cannot be reasonably applied." RCW 77.15.194(4)(b).

In 2013, the Department transferred the responsibility of wildlife conflict management from the law enforcement division to its wildlife division. To carry out the transition, the Department's wildlife division began to institute new rules to manage wildlife conflict. It filed proposed rules, identifying ten existing rules that would be amended, two that would be repealed, and six that would be new rules. The Department solicited comments from interested parties and conducted two public hearings.

At some point in 2014, the Department convened an internal committee tasked with reviewing all policies and procedures related to the Program. The committee consisted of conflict specialists, research biologists, and law enforcement staff.

In January 2016, the Department formally adopted and filed the proposed rules, two of which are at issue here: WAC 220-440-210 (the timber hunt rule) and WAC 220-417-040 (the special trapping rule).

I.     LAWSUIT

CBD filed a lawsuit against the Department in May 2018. In one claim, CBD challenged 73 black bear timber damage permits from the 2018 season, arguing that the issuance of these

5

permits was arbitrary and capricious and outside of the Department's statutory authority.[6]   In another claim, the CBD alleged that the timber hunt rule and the special trapping rule were arbitrary and capricious and that they exceeded the Department's statutory authority.  Finally, CBD claimed that the policies implementing the 2018 timber damage program were rules that were promulgated without required rulemaking procedures.  CBD calls these policies "Unpublished Rules."  Clerk's Papers (CP) at 3552.  CBD sought declaratory judgment and asked the court to enjoin the Department from issuing further permits that authorized the killing of black bears using bait, traps, or dogs until the permits were issued in compliance with RCW 77.15.194, RCW 77.15.245, and the Administrative Procedure Act (APA).

The court granted a motion to intervene by the Western Forestry and Conservation Association (Intervenor), a timber industry interest group.

The Department and CBD began cooperating to develop a record for judicial review.  Although RCW 34.05.370 requires an agency to maintain an official rulemaking file for each rule that it proposes or adopts, the Department appears to have not complied with this statute, or at a minimum, it did not maintain a complete file.  There is a discrepancy as to what the official rulemaking file contained.[7]

---

[6] CBD challenges the permits under RCW 34.05.570(4)(c), which allows "Relief for persons aggrieved by the performance of an agency action, including the exercise of discretion, . . . can be granted only if the court determines that the action is . . . (i) Outside the statutory authority of the agency or the authority conferred by a provision of law . . . [or] (iii) Arbitrary and capricious." This section of the Administrative Procedure Act (APA) allows a challenge to an "agency action" that is not a rulemaking or an agency order following an adjudicative proceeding.

[7] According to e-mails sent by the Department's counsel in July 2018, the rulemaking file contained 319 documents.  In October 2019, the rulemaking file contained 16,512 documents. After the Department sent a draft record to CBD in November, the rulemaking file contained 14,376 documents.  The rulemaking file submitted to the court contains 78 documents.

In a June 26 e-mail, counsel for the Department listed "categories of documents [she] identified as relevant" to CBD's claims regarding the adoption of the timber hunt and special trapping rules. CP at 952. The list included: "[The Department's] 2016 rule-making file[,] . . . Commission written materials for rules or program from 2013-2016[,] . . . [State Environmental Policy Act] analysis for 2016 rules and July 2015-June 2021 Game Management Plan[,] . . . Citations to data, factual information, studies, or reports[,] . . . Workgroups on rules or program from 2013-2016[,] . . . [and] Annual reports about program." CP at 952-53.

In September, the parties informed the court in a joint scheduling questionnaire that the "case is not ready for trial because [the Department's] record is not complete" and "Petitioner's and Respondent-Intervenor's counsel have cooperated with [the Department's] counsel to facilitate production of a shortened record, but collection and processing of [the Department's] documents has taken longer than anticipated due to the volume and size of documents. [The Department's] record is currently 191,348 documents." CP at 333-34. In early October, the parties entered into an agreement that provided that the Department would give CBD the opportunity to review the record prior to the Department filing it with the court. It also provided that if the Department declined to include requested documents, CBD would be allowed to file a motion to supplement the record.

In late October, the Department provided a draft record to the parties containing approximately 60,000 documents. CBD informed the Department that it only received 20,000 documents identified by file name as relevant to the case, with an additional 40,000 unidentified documents. CBD informed the Department that it was willing to cooperate to agree to a shortened record, but it appeared that "the state need[ed] to start [the] process over again, so it [could] present . . . a coherent and accurate proposed record." CP at 372.

7

In a late November joint status report, the Department informed the court that it needed more time to compile the record because the production thus far contained "substantial non-relevant and duplicative documents." CP at 341. The Department attributed the production problems to having to quickly gather the record to facilitate a hearing on the merits as soon as possible, and to encountering significant errors in a database search inquiry. CBD explained that it "examined the proposed record . . . and found it to be voluminous and disorganized, and to contain substantial numbers of non-relevant and duplicative documents" but it would continue discussions with the Department "regarding the case schedule and the implications of [the Department's] delay in certifying the agency record." CP at 342.

In January 2019, the Department informed the court it believed it would "be able to provide opposing and intervening counsel with a draft agency record index and draft copy of the proposed agency record for review by the end of February." CP at 345. On February 21, the Department filed the agency record with the court. It did not first provide CBD with a draft or an opportunity to discuss the record. The record consisted of approximately 2,600 documents comprising approximately 5,000 pages.

A week later, CBD filed a motion to remand the record to the agency under RCW 34.05.562(2).[8] It argued that the Department "filed an incomplete record that lacks the fundamental content necessary for the Court to review the challenged agency actions, excluding even documents that [the Department] previously assured the parties would be included." CP at 608. The Department responded, explaining that it did not adhere to the prior agreement to provide

---

[8] RCW 34.05.562(2) provides that, "The court may remand a matter to the agency, before final disposition of a petition for review, with directions that the agency conduct fact-finding and other proceedings the court considers necessary . . . [if] (c) The agency improperly excluded or omitted evidence from the record."

the record to CBD prior to filing it with the court because the "[c]ourt urged [the Department] to move forward as quickly as possible to file the record, and instructed the parties to prepare for an April 26, 2019 hearing on the merits." CP at 630.

In opposing the motion to remand, the Department insisted that the record contained everything it considered in promulgating the rules at issue. CBD withdrew its motion to remand the agency record in reliance on the Department's insistence that "the agency record is complete, and that none of the individual documents or categories of documents described in the Motion to Remand were . . . required to be part of the rulemaking file, or were 'considered by' the agency" in promulgating the rule. CP at 771.

Soon thereafter, the Intervenor moved to dismiss as moot or alternatively to bifurcate CBD's claims challenging the individual 2018 permits. The court granted the motion and dismissed the claims.

On June 25, CBD moved to supplement the record with 135 documents, totaling approximately 2,600 pages that it obtained from public sources, record requests, and from the Department's 60,000 document draft record sent to CBD in October. The Department opposed the motion.

On August 9, the court heard both arguments on the motion to supplement and arguments on the merits of the lawsuit. The court denied the motion to supplement. First, it ruled that the motion "was filed and argued extremely late in these proceedings." CP at 3747. The court stated

> [it] does not know where the fault lies and recognizes that the record is voluminous, but the Court has previously indicated its frustration to the parties that the agency record was not filed in a way that the Court thought would have been timely for this case. . . .[and] [g]iven the Court's previous direction that this case be expedited, the Court finds no justification for the lateness of filing the motion to supplement the agency record.

9

CP at 3747-48. Second, the court also stated that it agreed with "each and every" one of Department's arguments against supplementation.[9] CP 3748.

II.   THE RECORD CONSIDERED BY THE TRIAL COURT

The administrative record submitted to the court by the Department had three sections. The first section comprised most of the record and corresponded to CBD's first two claims that the 85 individual timber depredation permits from 2018 exceeded the Department's statutory authority and that they were arbitrary and capricious.

The second section, comprised of the relevant parts of the rulemaking file, corresponds to CBD's challenge to the timber hunt and special trapping rules. It contains code reviser forms required by the APA, including the concise explanatory statement[10] summarizing public comments and the Department's response to those comments. It also contains the full text of each public comment and response, and materials relating to public hearings before the commission.

The third section of the record contains "guidance" documents or "unpublished rules" corresponding to the claim that the Department adopted rules without proper rulemaking procedures.

---

[9] The Department argued that the proposed supplemental documents did not present evidence necessary to resolve issues disputed in the rulemaking claim. It further argued that the documents only tangentially related to the rulemaking and many post-dated the rulemaking. It also argued that the APA does not require an agency to include internal agency documents or scientific publications in the rulemaking file.

[10] Under RCW 34.05.325(6)(a), "[b]efore it files an adopted rule with the code reviser, an agency shall prepare a concise explanatory statement of the rule."

The 2016 WAC provisions contain minimal detail about the procedures that the Department employed to decide when to issue permits and what conditions attach to the permits.[11] The details of the permit program were set out in Department "guidance documents" or what CBD calls "unpublished rules." Among the guidance documents is the form to request a timber damage permit and an affidavit form that lists the conditions of participating in the program and the circumstances that preclude a person from participating in the program. Also included is a brochure explaining the application process, a bait site registration form, and instructions for setting bait. The final document is a chart that describes the Department's standard operating procedure for different aspects of the program.[12]

At the hearing on the merits, the Department argued that CBD failed to demonstrate standing to pursue the claim that the Department failed to use rulemaking procedures to adopt the 2018 guidance documents. Department argued that CBD had failed to show that its members had a concrete interest in the documents.

CBD submitted declarations from two members, Kurt Beardslee and Timothy Coleman. Beardslee is the co-founder of Wild Fish Conservancy and was a strong proponent of I-713 because of his concerns with the incidental catch of non-target species and the suffering of animals caught

---

[11] For example, WAC 220-440-210(2)(b) provides that timber damage will be defined "in criteria developed by the department." The section entitled "Black bear removal criteria" provides that a landowner may submit a request for a permit "following the procedures established by the department." WAC 220-440-210(2)(a). It also provides that harvested bears must be disposed of "as conditioned on the permit." WAC 220-440-210(5)(b).

[12] This chart includes details on: the length of the permit, the requirements for an initial permit which includes the definition of damage, the requirements for additional permits in the same season, the number of bears per permit, the dates of the hunting season, the permit and pursuit boundaries, carcass retention, use of bait, disclosure of location of supplemental feed stations, the removal method used by the hunter, and the required hunting license and permits and conditions of disqualification from participation in the program. It is not clear from the document whether it is only used by the Department internally, or whether it is available to participants in the program.

in traps. He co-authored the statement for I-713 in the voter's pamphlet. He has also encountered baiting sites and finds them deeply disturbing. He lives in the country and he regularly enjoys observing black bears engaging in their natural behaviors. He has spent many months on the Olympic Peninsula, particularly near the Sol Duc and Elwha Rivers. He always hopes to see black bears when out on the peninsula and feels great pleasure when he does. "It pains [him] to know that the bears that [he] cherishes may be dying in brutal traps nearby." CP at 3539. He believes a favorable decision from a court would redress his injuries because he would be more likely to experience bears in the wild, and not be distressed about the possibility of encountering fewer bears or encountering signs of inhumane hunting practices.

Coleman is a hunter and Executive Director of Kettle Range Conservation Group. He worked on the campaigns for I-713 and I-655 by gathering signatures because of his concern about the treatment of predators. He lives "out in the wildlands" and enjoys observing bears engaging in their natural behavior there. CP at 3542. He has encountered bear baiting stations in the woods. He regularly hikes in several areas near where the Department has issued black bear timber depredation permits, including Mt. St. Helens and Olympic National Park and always looks forward to seeing bears or signs of bears in those areas. He believes that if the Department is prohibited from permitting the killing of black bears in ways contrary to the initiatives, it would result in less inhumane hunting of bears, including those that he might otherwise observe in areas that he hikes in.

The court entered a final order denying CBD's petition for judicial review and declaratory and injunctive relief. It determined that the challenged rules did not exceed the Department's statutory authority, and that CBD failed to meet the burden to show that the rules were arbitrary and capricious. The court determined that CBD did not have standing to challenge the

"unpublished rules." It also concluded that even if CBD had standing, the contents of the policy documents did not meet the definition of "rules"; therefore, the Department did not need to engage in formal rulemaking procedure. CBD appeals.

## ANALYSIS

I.     MOTION TO SUPPLEMENT THE RECORD ON APPEAL

CBD filed a motion directly with this court to supplement the appellate record with 28 of the 135 original documents it moved the trial court to admit. CBD argues that we should supplement the record under RCW 34.05.562 because the evidence relates to the validity of the rulemaking at the time it was taken, and it is needed to decide disputed issues regarding material facts in rulemaking. CBD argues in the alternative that we admit the proposed documents under RAP 9.11.

We deny CBD's motion to supplement the record. CBD has not provided us with persuasive authority that either RCW 34.05.562 or RAP 9.11 gives us the authority to supplement the record in this manner. Granting the motion on the merits would render the superior court's order meaningless and change our standard of review from abuse of discretion to de novo. It would also substantially change our role as a reviewing court.

However, we may take judicial notice of facts outside the record if they meet the criteria under ER 201, or if they are considered legislative facts. *Cameron v. Murray*, 151 Wn. App. 646, 658-59, 214 P.3d 150 (2009). Legislative facts are "background information a court may take into account 'when determining the constitutionality or proper interpretation of a statute, or when extending or restricting common law rule.'" *Cameron*, 151 Wn. App. at 658-59 (quoting 5D WASH. PRAC. HANDBOOK WASH. EVID. ER 201, cmt. (1) (2008-09 ed.)). Legislative facts include

scholarly works, scientific studies, and social facts. *Wyman v. Wallace*, 94 Wn.2d 99, 102, 615 P.2d 452 (1980).

We take judicial notice of the Department's Game Management Plan for background information, and the voter pamphlets from 1996 and 2000 for background information as well as to assist us in determining voter intent.

II.     MOTION TO SUPPLEMENT IN THE TRIAL COURT

CBD argues that the court abused its discretion in denying the motion to supplement primarily based on the fact that it was "'filed and argued extremely late in the proceedings,'" despite the fact that the Department was primarily responsible for the delay. Br. of Appellant at 48 (quoting CP at 4737). CBD also argues that the court's final ruling, where it relied on each and every one of the Department's arguments, did not give genuine consideration to the merits. CBD contends that this failure is evidenced first by the court's pro forma ruling that CBD did not meet the statutory criteria without citing or examining the standard set by the APA for supplementation. We conclude the court abused its discretion in denying the motion to supplement.

CBD asks us to review the trial court's denial of the motion to supplement the agency record de novo. However, we review a trial court's denial of a motion to supplement the record under RCW 34.05.562 for an abuse of discretion. *Samson v. City of Bainbridge Island*, 149 Wn. App. 33, 64-65, 202 P.3d 334 (2009).

"A trial court abuses its discretion if its decision is manifestly unreasonable or exercised on untenable grounds or for untenable reasons." *McCoy v. Kent Nursery, Inc*., 163 Wn. App. 744, 758, 260 P.3d 967 (2011). A trial court's decision is manifestly unreasonable if "'the court, despite applying the correct legal standard to the supported facts, adopts a view that no reasonable person

would take.'" *Mayer v. Sto Indus., Inc.*, 156 Wn.2d 677, 684, 132 P.3d 115 (2006) (internal quotation marks omitted) (quoting *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003)).

III.    LEGAL PRINCIPLES

When a court reviews agency action, the agency is responsible for creating the record for review, which "shall consist of any agency documents expressing the agency action, other documents identified by the agency as having been considered by it before its action and used as a basis for its action, and any other material described in this chapter as the agency record for the type of agency action at issue." RCW 34.05.566(1).

The APA requires that an agency maintain an official rulemaking file for each rule that it proposes or adopts. RCW 34.05.370(2) governs what the file must contain. "Upon judicial review, the file required by [RCW 34.05.370] constitutes the official agency rule-making file with respect to that rule." RCW 34.05.370(4). In a rulemaking challenge, "the agency's rule-making file serves as the record." *Musselman v. Dep't of Soc. & Health Servs.*, 132 Wn. App. 841, 853, 134 P.3d 248 (2006). The reviewing court must consider the rulemaking file "and the agency's explanations for adopting the rule." Wa*sh. Indep. Tel. Ass'n v. Wash. Utils. & Transp. Comm'n*, 148 Wn.2d 887, 906, 64 P.3d 606 (2003).

The court may receive evidence in addition to that contained in the agency record for judicial review, only if it relates to the validity of the agency action at the time it was taken and if it is needed to decide disputed issues regarding:

> (a) Improper constitution as a decision-making body or grounds for disqualification of those taking the agency action;
> (b) Unlawfulness of procedure or of decision-making process; or
> (c) Material facts in rule making, brief adjudications, or other proceedings not required to be determined on the agency record.

RCW 34.05.562(1).

RCW 34.05.562(2) also provides that: "The court may remand a matter to the agency, before final disposition of a petition for review, with directions that the agency conduct fact-finding and other proceedings the court considers necessary . . . [if] (c) The agency improperly excluded or omitted evidence from the record." When supplemental evidence is admissible, "it is admissible because it falls squarely within the statutory exceptions listed in RCW 34.05.562(1)." *Motley-Motley, Inc. v. State*, 127 Wn. App. 62, 76, 110 P.3d 812 (2005).

It is clear that the Department's substantial difficulty in compiling the agency record for review caused multiple months of delays. When finally submitted, the Department failed to include documents that the parties previously agreed belonged in the record. CBD attempted to enforce its agreement first by moving to remand the record to the agency, and then by moving to supplement the record. It filed the motion to supplement more than a month before the hearing, yet the court based its denial in part on the timeliness of the motion. And we note that the court informed the parties that it "actually reviewed the briefing and citations . . . to both the agency record and [the] proposed supplemental record." RP (Aug.9, 2019) at 26. The size and content of the record varied over time. CBD filed its motion to supplement in a timely fashion.

Although the court also stated that it "relied on each and every one of the Department's arguments" against supplementation, it seemingly did not take into account the parties' prior agreements regarding the record or the need for the documents.[13] CP at 3748. It also appears that the court did not consider that CBD filed claims other than those attacking the actual rule. Those

---

[13] In considering the motion to supplement directly with this court, we reviewed the proposed supplemental evidence. While some of the Department's arguments against supplementation may be correct, some of the documents are clearly relevant to CBD's claims that the Department acted arbitrarily and capriciously in adopting the timber hunt rule, and that the Department engaged in unlawful rulemaking.

records were not only agreed upon by the parties, but their absence did not allow CBD to argue all of its claims. The court abused its discretion by denying the motion to supplement.

IV.   DEPARTMENT STATUTORY AUTHORITY

A.      Legal Principles

The validity of an agency's rule, as well as its rulemaking authority are issues of law that we review de novo. *Wash. State Hosp. Ass'n v. Dep't of Health*, 183 Wn.2d 590, 595, 353 P.3d 1285 (2015). The party challenging agency action has the burden to demonstrate invalidity of that action. RCW 34.05.570(1)(a); *Ass'n of Wash. Bus. v. Dep't of Revenue*, 155 Wn.2d 430, 437, 120 P.3d 46 (2005).

"[W]here the Legislature has specifically delegated rule-making authority to an agency, the agency's regulations are presumed valid, and only compelling reasons demonstrating that the regulation conflicts with the intent and purpose of the legislation warrant striking down a challenged regulation." *Armstrong v. State*, 91 Wn. App. 530, 536-37, 958 P.2d 1010 (1998).

A court must declare an administrative rule invalid if it finds that "the rule exceeds the statutory authority of the agency." RCW 34.05.570(2)(c). Administrative "[r]ules must be written within the framework and policy of the applicable statutes," *Dep't of Labor & Industries v. Gongyin*, 154 Wn.2d 38, 50, 109 P.3d 816 (2005), and so long as the rule is "reasonably consistent with the controlling statute[s]," an agency does not exceed its statutory authority. *Wash. Pub. Ports Ass'n v. Dep't of Revenue*, 148 Wn.2d 637, 646, 62 P.3d 462 (2003).

However, "'[a]dministrative rules or regulations cannot amend or change legislative enactments.'" *Dep't of Ecology v. Campbell & Gwinn, LLC*, 146 Wn.2d 1, 19, 43 P.3d 4 (2002) (quoting *Dep't of Ecology v. Theodoratus*, 135 Wn.2d 582, 600, 957 P.2d 1241 (1998)). Rules

that are not consistent with or are broader than the statutes they implement are invalid. *Wash. State Hosp. Ass'n*, 183 Wn.2d at 595.

Standard rules of statutory construction apply to initiatives. *Amalgamated Transit Union Local 587 v. State*, 142 Wn.2d 183, 205, 11 P.3d 762 (2000). "[I]n determining the meaning of a statute enacted through the initiative process, the court's purpose is to ascertain the collective intent of the voters who, acting in their legislative capacity, enacted the measure." *Amalgamated Transit Union Local 587*, 142 Wn.2d at 205. "'In construing the meaning of an initiative, the language of the enactment is to be read as the average informed lay voter would read it.'" *Am. Legion Post #149 v. Dep't of Health*, 164 Wn.2d 570, 585, 192 P.3d 306 (2008) (internal quotation marks omitted) (quoting *State v. Brown*, 139 Wn.2d 20, 28, 983 P.2d 608 (1999)). "'Where the language of an initiative enactment is plain, unambiguous, and well understood according to its natural and ordinary sense and meaning, the enactment is not subject to judicial interpretation.'" *Am. Legion Post #149*, 164 Wn.2d at 585 (internal quotation marks omitted) (quoting *Amalgamated Transit Union Local 587*, 142 Wn.2d at 205). However, if there is ambiguity, the court may examine the statements in the voters' pamphlet in order to determine the voters' intent. *Am. Legion Post #149*, 164 Wn.2d at 585-86.

Our "'goal is to avoid interpreting statutes to create conflicts between different provisions so that we achieve a harmonious statutory scheme.'" *Am. Legion Post #149*, 164 Wn.2d at 585 (quoting *Echo Bay Cmty. Ass'n v. Dep't of Nat. Res.*, 139 Wn. App. 321, 327, 160 P.3d 1083 (2007)). Also, we must construe statutes such that no provision is rendered meaningless or superfluous. *Whatcom County v. City of Bellingham*, 128 Wn.2d 537, 546, 909 P.2d 1303 (1996).

B.       WAC 220-440-210, and Baiting

CBD argues that the Department exceeded its statutory authority when it adopted WAC 220-440-210 because it gave the agency discretion to issue bear baiting permits to any private hunter "authorized" by the Department.  It contends that RCW 77.15.245 only allows agents of the county, state, or federal agencies while acting in their official capacity to use bait.  We agree.

RCW 77.15.245 states in relevant part:

(1) Notwithstanding the provisions of RCW 77.12.240, 77.36.030, or any other provisions of law, it is unlawful to take, hunt, or attract black bear with the aid of bait.
(a) Nothing in this subsection shall be construed to prohibit the killing of black bear with the aid of bait by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety.
(b) Nothing in this subsection shall be construed to prevent the establishment and operation of feeding stations for black bear in order to prevent damage to commercial timberland.
. . . .
(d) As used in this subsection, "bait" means a substance placed, exposed, deposited, distributed, scattered, or otherwise used for the purpose of attracting black bears to an area where one or more persons hunt or intend to hunt them.
(2) Notwithstanding RCW 77.12.240, 77.36.030, or any other provisions of law, it is unlawful to hunt or pursue black bear, cougar, or bobcat with the aid of a dog or dogs.
(a) Nothing in this subsection shall be construed to prohibit the hunting of black bear, cougar, or bobcat with the aid of a dog or dogs by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety. A dog or dogs may be used by the owner or tenant of real property consistent with a permit issued and conditioned by the director.

WAC 220-440-210, the timber hunt rule, states in relevant part:

This section applies to any person participating in a director-authorized black bear timber depredation hunt pursuant to RCW 77.12.240[14] or 77.15.245.[15]

---

[14] The Department's authority to take wildlife.

[15] The recreational ban on hunting with dogs or bait.

(1) Definitions: As used in this section and in the context of bear depredation removals for damage to timberlands, the following definitions apply:

(a) "Damage to timberlands" means there is evidence that bears have damaged private commercial timber that is confirmed through criteria outlined by the department.

(b) "Removal" means the act of killing one or more bear.

(2) Black bear removal criteria:

(a) A landowner or the landowner's designee may submit a request for removal to the department following the procedures established by the department.

(b) Areas permitted for black bear timber depredation action must have confirmed bear caused timber damage as defined in criteria developed by the department.

(c) The department will verify reported damage.

(d) The department will consider forest management objectives and shall ensure bear removals are consistent with population management objectives.

(3) Hunter selection:

(a) Landowners or the landowner's designee may only select hunters authorized by the department to participate in a black bear timber depredation removal effort on their property.

(b) The landowner or the landowner's designee and the hunters participating in the removal will be identified as permittees on permits issued for bear removal.

The statute provides that it does not "prohibit the killing of black bear with the aid of bait by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety." RCW 77.15.245(1)(a). The timber hunt rule more expansively provides that, "Landowners or the landowner's designee may only select hunters authorized by the department to participate in a black bear timber depredation removal effort on their property." WAC 220-440-210(3)(a).

The rule allows the Department to issue baiting permits to any hunter "authorized by" the agency, but the statute requires that the hunter be an "agent" of a county, state, or federal agency. If this rule has amended or changed a legislative enactment and exceeded its statutory authority, we invalidate the rule. Both the Department and the Intervenor argue that we should not give the term "agent" a legal meaning. Rather, they contend we should look at how an average lay voter would read the term "agent" because it is unlikely that the average voter would intend the term as

it is used in agency law. They suggest that a lay voter would view an agent as someone authorized by a government to do something.

In interpreting this rule, we note that the statute says that bait may be used "by employees or agents of county, state, or federal agencies while acting in their official capacities for the purpose of protecting livestock, domestic animals, private property, or the public safety." RCW 77.15.245(1)(a). The juxtaposition of "agent" with "employee" and inclusion of "in their official capacity," indicates that the voters intended something stricter than what the Department and Intervenor suggest, which seems to be, any person to whom the Department decides to issue a permit.

The statutory meaning is not clear from the language because "agent" can have more than one "natural and ordinary sense and meaning." *Am. Legion Post #149*, 164 Wn.2d at 585. Because the statute is ambiguous, we must ascertain the collective intent of the voters. We may look to the voter's pamphlet to determine intent. *Am. Legion Post #149*, 164 Wn.2d at 585.

The voter's pamphlet is only slightly helpful because it merely repeats that bait can "still be used by employees or agents of federal, state or county agencies." *State of Washington Voters Pamphlet*, *General Election* 6, at 7 (Nov. 6, 1996) (1996 Voters Pamphlet), https://www.sos.wa.gov/_assets/elections/voters'%20pamphlet%201996.pdf. However, the voter's pamphlet makes clear that the initiative intended to ban what the voters considered "unfair, unsporting and inhumane" methods of hunting. The only exception to the use of bait being those "employees or agents . . . acting to protect . . . private property." 1996 Voter Pamphlet at 7. This language indicates that voters intended the exception to baiting to be a narrow one.

Moreover, the dictionary defines "agent" as: "a person governed, guided or instigated by another in some action" or "one that acts for or in the place of another by authority from him."

21

WEBSTER'S THIRD NEW INT'L DICTIONARY 40 (2002). The definition lists as examples the head of an agency beholden to the executive, or a government "representative, emissary or official." WEBSTER'S THIRD NEW INT'L DICTIONARY 40 (2002).

Furthermore, our "'goal is to avoid interpreting statutes to create conflicts between different provisions so that [it] achieve[s] a harmonious statutory scheme.'" *Am. Legion Post #149*, 164 Wn.2d at 585 (quoting *Echo Bay Cmty. Ass'n*, 139 Wn. App. at 327).

The statutory scheme governing the Department's management of wildlife contains several provisions that also use "agent." For example, RCW 77.15.010 provides that "a person is not guilty of a crime under [the Fish and Wildlife Enforcement Code] if the person is an officer, employee, or agent of the department lawfully acting in the course of his or her authorized duties." This statute clearly contemplates a legal agency relationship.

More importantly, RCW 77.12.077(1) requires "The commission [to] adopt by rule a process and criteria to select persons who may act as agents of the state for the purpose of using one or more dogs to hunt or pursue black bear. . . to protect livestock, domestic animals, private property, or the public safety." This statute, which was adopted in 2019 by the legislature, is meant to govern the Department's non-lethal program for the purpose of training dogs to hunt bear and cougar. The legislature subsequently amended RCW 77.15.245 to allow this program.[16] H.B. 1516, 66th Leg., Reg. Sess. (Wash. 2019).

When the legislature codified RCW 77.12.077, it intended "agent" to carry its legal meaning. Meaning a relationship where the Department has a right to control the conduct of the

---

[16] "Nothing in this subsection may be construed to prohibit nonlethal pursuit training of dogs by persons selected through the process established in RCW 77.12.077 for future use for the purpose of protecting livestock, domestic animals, private property, or the public safety." RCW 77.15.245(2)(d).

agent and the agent has the power to affect the legal relations of the Department. *See Moss v. Vadman*, 77 Wn.2d 396, 403, 463 P.2d 159 (1969) (discussing and defining an agency relationship). To interpret this statute and RCW 77.15.245 to have different meanings would make little sense.

Given the voter's intent discussed above, and our goal to achieve a harmonious statutory scheme, we conclude that the rule authorizes the Department to issue permits only to those allowed by the statute. The permits issued by the Department explicitly disclaim an agent-principal relationship with hunters engaging in depredation hunts and refer to permittees exclusively as independent contractors. Because the Department's rule has amended or changed a legislative enactment and because the rule exceeds the Department's statutory authority, the rule is invalid.

C.      WAC 220-440-210 and Hounding

CBD argues that the Department exceeded its authority because the timber hunt rule gives the agency discretion to issue hounding permits to any private hunter "authorized by" the Department, when I-655 only exempts "the owner or tenant of real property" or "agents of county, state, or federal agencies while acting in their official capacities" to use these hunting methods. Br. of Appellant at 17, 20-21. We agree.

We utilize the same process as above, first looking at the plain meaning of the statute. We look to see whether the rule that allows the Department to issue permits to a landowner or a landowner's designee, who may then select a hunter "authorized by" the Department, is consistent with the statutory language that "[a] dog or dogs may be used by the owner or tenant of real property consistent with a permit issued and conditioned by the director." RCW 77.15.245(2)(a).

The statutory language that "[a] dog or dogs may be used by the owner or tenant of real property" is unambiguous. RCW 77.15.245 (2)(a). A landowner or tenant may use dogs. It does

not follow from this language that a landowner may choose a designee who may then choose a hunter to use dogs. The Department and Intervenor suggest such a reading could not possibly be what the voters intended because it would preclude owners without dogs, or large timber corporations from contracting with a hunter to use dogs. However, under the statute no landowner, corporation or otherwise, is precluded from contracting with an agent of a county, state or federal agency that uses dogs. RCW 77.15.245(2)(a). Again, we conclude that that the rule exceeds the Department's statutory authority and is invalid.[17]

D.     WAC 220-417-040 and Trapping

CBD argues that I-713 banned the use of traps but allowed the Department to issue special permits for such traps "[u]pon 'making a *finding in writing* that the animal problem has not been and cannot be reasonably abated by nonlethal control tools.'" Br. of Appellant at 21 (quoting RCW 77.15.194(4)(b)). CBD contends that the Department exceeded its statutory authority when it adopted the special trapping rule, which gave the agency discretion to issue bear trapping permits without making any findings. It argues that the rule's language that a permit "'*may* be denied'" if appropriate non-lethal methods have not been utilized, conflicts with the statutory requirement that a permit cannot issue unless there is a finding in writing that the landowner has an animal problem and has tried and failed to abate the problem through reasonable non-lethal means. Br. of Appellant at 22 (quoting WAC 220-417-040(14)(a)). We disagree with CBD.

RCW 77.15.194 (I-713) states in relevant part:

> (1) It is unlawful to use or authorize the use of any steel-jawed leghold trap, neck snare, or other body-gripping trap to capture any mammal for recreation or commerce in fur.
> . . . .

---

[17] CBD makes further arguments based on evidence not in the record. Because we conclude that the timber hunt rule is invalid, we do not reach these arguments.

(b) Nothing in this section prohibits the director from granting a special permit to use traps listed in this subsection to a person who applies for such a permit in writing, and who establishes that there exists on a property an animal problem that has not been and cannot be reasonably abated by the use of nonlethal control tools, including but not limited to guard animals, electric fencing, or box and cage traps, or if such nonlethal means cannot be reasonably applied. Upon making a finding in writing that the animal problem has not been and cannot be reasonably abated by nonlethal control tools or if the tools cannot be reasonably applied, the director may authorize the use, setting, placing, or maintenance of the traps for a period not to exceed thirty days.

WAC 220-417-040, the special trapping rule, states in relevant part:

(1) As used in this section, unless the context clearly requires otherwise, the following definitions apply:

. . . .

(b) "Body-gripping trap" as defined by RCW 77.15.192 means a trap that grips an animal's body or body part.

. . . .

(f) "Special trapping permit" means a permit issued to a person under the authority of RCW 77.15.194 and the provisions of this section to use certain body-gripping traps to abate an animal problem.

(g) "Permittee" means the person to whom a special trapping permit is granted.

(2) It is unlawful to trap wildlife using body-gripping traps without a special trapping permit issued by the department.

(3) It is unlawful to fail to comply with any conditions of a special trapping permit to trap.

. . . .

(14) A special trapping permit may be denied when, in the judgment of the department:

(a) Other appropriate nonlethal methods to abate damage have not been utilized;

(b) The alleged animal problem either does not exist or the extent is insufficient to justify lethal removal;

(c) The use of the requested body-gripping trap(s) would result in direct or indirect harm to people or domestic animals;

(d) The use of the requested body-gripping trap(s) would conflict with federal or state law, local ordinance or department rule.

(e) The application is incomplete.

At issue is whether the use of the word "may" in WAC 220-417-040(14) gives the Department discretion to issue a permit without making the finding in writing as required by RCW 77.15.194(1)(b). Section 14 lists circumstances which in "the judgement of the department" a trapping permit may be denied. WAC 220-417-040. It includes when "[o]ther appropriate

nonlethal methods to abate damage have not been utilized" or "[t]he alleged animal problem either does not exist or the extent is insufficient to justify lethal removal." WAC 220-417-040(14)(a), (b). The rule does not govern the Department's requirements for the issuance of a permit.[18] Listing circumstances in which the Department can deny a permit is "reasonably consistent with the controlling statutes." *Wash. Pub. Ports Ass'n*, 148 Wn.2d at 646. We conclude that the special trapping rule does not exceed the Department's statutory authority and it is valid.

V.     ARBITRARY AND CAPRICIOUS WAC 220-440-210

CBD argues that the Department acted arbitrarily and capriciously in adopting the timber hunt rule because the lack of certain documents, or entire categories of documents from the rulemaking file indicates that the agency gave no thought to science or any fundamental facts and circumstances relating to black bear timber depredation. CBD argues that the Department promulgated a rule to continue a program without considering the problem the rule was designed to address, the effectiveness of the program the rule governed, the scientific basis for the rule's approach, the rule's potential negative consequences, the existence of potential alternatives, or whether the rule aligned with its strategic plan. CBD further argues that the Department acted arbitrarily and capriciously when it adopted wildlife management rules while willfully disregarding science and the opinions of its internal subject-matter experts.

---

[18] The companion rule, not at issue here, states that traps may be used with a special trapping permit issued by the director "To abate damages caused to private property, domestic animals, livestock or timber, which cannot be reasonably abated by nonlethal control tools. Any person requesting a special trapping permit must apply in writing, stating the threat or damages, the nonlethal control methods attempted or why they cannot be applied, and agree to use the above traps for no more than thirty days under the permit granted, pursuant to RCW 77.15.194 and WAC 220-417-040."

This claim relies primarily on supplemental evidence. Because the trial court abused its discretion in denying the motion to supplement the record, we remand this issue to the trial court to consider, allowing supplementation as appropriate.

VI.    FAILURE TO FOLLOW NOTICE AND COMMENT RULEMAKING PROCEDURE

CBD argues that the documents it wants to supplement the record with, and the Department's 2018 guidance documents add additional requirements and conditions to the applicable statutes and rules we have previously discussed. They contend that these documents demonstrate that the Department engaged in unlawful rulemaking because they were promulgated without proper rulemaking procedures. We remand this issue to the trial court.

A.    Waiver of Standing

The Department and Intervenors argue that CBD failed to assign error to the trial court's conclusion of law that it lacked standing to bring the claim that the Department engaged in unlawful rulemaking. They contend that CBD's failure to assign error or argue standing in the opening brief precludes us from considering the claim. We disagree.

Generally, a party's appellate briefing must include a "separate concise statement of each error a party contends was made by the trial court, together with the issues pertaining to the assignments of error," as well as "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." RAP 10.3(a)(4), (6).

A party's failure to assign error to an issue, by itself, does not necessarily result in a court's refusal to consider that issue. *State v. Olson*, 126 Wn.2d 315, 320, 893 P.2d 629 (1995). We have "discretion to decide an issue a party fails to argue in its initial brief, especially where . . . the party

27

raised it below and addresses it in a reply brief." *In re Recall Charges Against Seattle Sch. Dist. No. 1 Dirs.*, 162 Wn.2d 501, 513, 173 P.3d 265 (2007).

At trial, the Department argued that CBD did not have standing to challenge the "unpublished rules." The court agreed and concluded that CBD failed to establish standing under RCW 34.05.530. On appeal, CBD does not assign error to or address this conclusion in its initial brief. However, the issue of standing was raised below, and by arguing the merits of the underlying issue, it is clear that CBD did not intend to abandon the issue. We conclude that CBD did not waive this issue.

B.      Standing of CBD's Members

The Department and Intervenor argue that CBD has failed to show that its members have a concrete interest in the "unpublished rules" and thus fails to establish standing for this claim. We disagree.

In order to invoke judicial review of agency actions, a party challenging the action must have standing, as defined by the APA. RCW 34.05.530. "Organizations have standing to assert the interests of their members, so long as members of the organization would otherwise have standing to sue, the purpose of the organization is germane to the issue, and neither the claim nor the relief requires the participation of individual members." *Five Corners Family Farmers v. State*, 173 Wn.2d 296, 304, 268 P.3d 892 (2011).[19]

A person is "aggrieved or adversely affected" by agency action under RCW 34.05.530 and thus has standing under the APA when:

(1) The agency action has prejudiced or is likely to prejudice that person;
(2) That person's asserted interests are among those that the agency was required to consider when it engaged in the agency action challenged; and

---

[19] Neither the Department nor Intervenor argue that CBD does not meet the other requirements of organizational standing. The only issue is whether CBD's members have standing to sue.

(3) A judgment in favor of that person would substantially eliminate or redress the prejudice to that person caused or likely to be caused by the agency action.

The three conditions in RCW 34.05.530 are derived from federal case law. *St. Joseph Hosp. & Health Care Ctr. v. Dep't of Health*, 125 Wn.2d 733, 739, 887 P.2d 891 (1995). The first and third conditions correspond to the injury-in-fact requirement, and the second condition corresponds to the federal "zone of interest" test. *Seattle Bldg. & Constr. Trades Council v. Apprenticeship & Training Council*, 129 Wn.2d 787, 793-94, 920 P.2d 581 (1996).

However, where the injury complained of is procedural in nature, standing requirements are relaxed. *Apprenticeship & Training Council*, 129 Wn.2d at 794-95.

To show a procedural injury, "a party must (1) identify a constitutional or statutory procedural right that the government has allegedly violated, (2) demonstrate a reasonable probability that the deprivation of the procedural right will threaten a concrete interest of the party's, and (3) show that the party's interest is one protected by the statute or constitution." *Five Corners Family Farmers*, 173 Wn.2d at 303.

"[E]nvironmental plaintiffs adequately allege injury in fact when they aver that they use the affected area and are persons 'for whom the aesthetic and recreational values of the area will be lessened' by the challenged activity." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 183, 120 S. Ct. 693, 145 L. Ed. 2d 610 (2000) (quoting *Sierra Club v. Morton*, 405 U.S. 727, 735, 92 S. Ct. 1361, 31 L. Ed. 2d 636 (1972)). "[T]he desire to use or observe an animal species, even for purely esthetic purposes, is undeniably a cognizable interest for purposes of standing." *Lujan v. Def. of Wildlife*, 504 U.S. 555, 562-563, 112 S. Ct. 2130, 119 L. Ed. 2d 351 (1992). Some federal courts have specifically recognized "that people have a cognizable interest in 'view[ing] animals free from . . . inhumane treatment.'" *Animal Legal Def. Fund, Inc. v.*

*Glickman*, 154 F.3d 426, 433 (D.C. Cir. 1998) (quoting *Humane Soc'y v. Babbitt*, 46 F.3d 93, 99 n.7 (D.C. Cir. 1995)).

The APA requires an agency to employ certain rulemaking procedures, which include providing the public with both notice of the proposed rule and an opportunity to comment on the proposal at a public rulemaking hearing. *See* RCW 34.05.320; RCW 34.05.325. "The purpose of such rule-making procedures is to ensure that members of the public can participate meaningfully in the development of agency policies which affect them. In enacting the 1988 APA, the Legislature intended to provide greater public access to administrative decisionmaking." *Simpson Tacoma Kraft Co. v. Dep't of Ecolog*y, 119 Wn.2d 640, 648-49, 835 P.2d 1030 (1992) (internal citation omitted).

Standing is reviewed de novo. *In re Estate of Becker*, 177 Wn.2d 242, 246, 298 P.3d 720 (2013). The party seeking judicial review of agency action bears the burden of establishing standing to obtain judicial review. *Snohomish County Pub. Transp. Ben. Area v. State Pub. Emp't Relations Comm'n*, 173 Wn. App. 504, 512, 294 P.3d 803 (2013).

CBD has met the first criterion to show a procedural injury. Any member of the public, or in this case group of members, has a statutory procedural right to participate in notice and comment rulemaking when the agency adopts a rule. *Simpson Tacoma Kraft Co.*, 119 Wn.2d at 648-49.

The parties disagree over whether CBD has met the second criterion to show a procedural injury to establish standing. At issue is whether CBD demonstrated a reasonable probability that the deprivation of the right to participate when the Department establishes the substantive details of the program threatens a concrete interest. *Five Corners Family Farmers,* 173 Wn.2d at 303.

The challenged documents establish the requirements for receiving a permit and the conditions of the permits. For example, the documents dictate: the definition of damage sufficient

to receive a permit, the radius around the damage in which a bear can be killed, the number of bears killed per permit, what hunting methods may be used, the hunting season length, and what the permittee must do with the bear's fur, gall bladder, and carcass. Conditions and requirements enumerated in the guidance documents directly determine how many bears are killed during the timber depredation hunting season, how many of those bears are baited, hounded, or trapped, and the number of bait sites used.[20] The conditions in the documents essentially dictate all of the pertinent details that ultimately determine whether the permit issued complies with the exemptions in the initiatives.

Petitioner's member declarations discuss their experience with bears, their hope that they continue to see bears and pleasure they feel viewing bears in their natural environment in areas near where depredation hunts occur. Beardslee finds the baiting cites he has seen "deeply disturbing," and is pained to know that bears may be dying in brutal traps nearby when he is out on the Olympic Peninsula. CP at 3538. Coleman regularly hikes in several areas near where the Department has issued black bear timber depredation permits, including Mt. St. Helens and Olympic National Park. The level of both members' interest in the treatment of bears they may encounter is evidenced by the fact that they both participated in campaigns to pass initiatives to protect black bears from certain types of hunting methods. The members participated in the campaigns then for the same reason they suffer injury now: they have an interest in ensuring the bears they encounter are not killed needlessly or inhumanely.

---

[20] The Department informed us in its supplemental brief that as of 2020, it does not issue "permits for foot snares or master hunters operating over bait." Supp. Br. of Resp't at 4. It is unclear if this language means that the Department does not allow baiting under any circumstances.

"The purpose of . . . rule-making procedures is to ensure that members of the public can participate meaningfully in the development of agency policies which affect them." *Simpson Tacoma Kraft Co.*, 119 Wn.2d at 649.[21] Formal rulemaking procedure would allow CBD's members to present alternative scientific information to assert their interest in ensuring only those that fall within the limited exception of the statutes are able to kill bears with those hunting methods. This in turn leads to more bears in their natural habitat that can be observed by the members.[22] CBD demonstrated a reasonable probability that the deprivation of their right to participate in notice and comment rulemaking will threaten a concrete interest.

The Department argues that CBD's members cannot establish standing because the declarations do not show that the members were even aware of the "unpublished rules," therefore they cannot have a concrete interest in them. But the relevant inquiry is whether the deprivation of the procedural right will threaten a concrete interest. CBD has established that its members have a concrete aesthetic and recreational interest in seeing bears in their natural habitat, seeing fewer "disturbing" bait sites, and ensuring the bears they encounter are not killed needlessly or

---

[21] To this end, the Department's own game management plan states that "[a]n easily accessible public involvement process is necessary to facilitate broad public involvement in developing and implementing management alternatives. The key is to develop programs that both achieve key biological objectives and are supported by the public." CP at 1385. This is consistent with the fact that the Department manages wildlife for the benefit of all Washingtonians. *State v. Longshore*, 97 Wn. App. 144, 150, 982 P.2d 1191 (1999).

[22] Although black bears are not at risk of becoming extinct, the interest expressed by CBD's members is not tied entirely to the species as a whole, as in some other cases involving animals, but to the treatment of individual members of that species. "[I]t does not make sense, as a matter of logic, to suppose that people suffer aesthetic injury from government action that threatens to wipe out an animal species altogether, and not from government action that [causes] some animals . . . [to] suffer[]." *Animal Legal Def. Fund, Inc.*, 154 F.3d at 438.

inhumanely. The guidance documents directly effect that concrete interest, whether the members know about them or not.

Finally, CBD is in the zone of interest meant to be protected. "In enacting the 1988 APA, the Legislature intended to provide greater public access to administrative decisionmaking." *Simpson Tacoma Kraft*, 119 Wn.2d at 649. We conclude that CBD has met its burden to establish standing for this claim.

C.       Mootness of Rulemaking

The Department argued that CBD's claim about unlawful rulemaking is moot because it has since replaced the documents at issue. The Department appended to its brief the replacement documents. Specifically, it included a template black bear timber damage depredation permit, a template black bear timber damage affidavit, and a standard operating procedures chart for the 2020 program. It did not include a brochure. It also did not include an updated version of the bait site registration form or the document detailing the procedures for the use of bait because the Department no longer "consider[s] the possibility of permitting the use of snares or hunting over bait." Supp. Br. of Resp't at 2.[23]

The Department identifies the differences between the remaining 2020 and 2018 documents. It "changed procedures for disposing of bears permitted to be killed for causing timber damage, as specified in the permits" in light of COVID-19. Supp. Br. of Resp't at 2-3. The 2020 permit and standard operating procedure chart state that hunters can retain all bear carcasses and the gall bladder must be frozen and returned to the Department "at a later date." Supp. Br. of Resp't Ex. A, C. The 2018 permit and standard operating procedure chart state that permittees

---

[23] It is unclear if this language means that bait is prohibited entirely, or whether it is allowed with non-snare traps.

must return all parts of the harvested bear to the Department. Finally, the new affidavit and the new permit now refer to the landowner or tenant as a permittee, and the hunters as sub-permittees. The 2018 affidavit and permits refer to both the landowner/tenant and the hunters as the permittee.

The Department argues that the unlawful rulemaking claim is moot. It asserts that the 2018 documents are no longer in use, and because it adopted 2020 documents that are "substantially different," a favorable decision would be purely academic.[24] The Department further argues that the public interest exception to mootness does not apply here because it is a private issue dealing with private resources on private land, a judicial determination would have little value for public officials and the likelihood that the issue would reoccur is slim.

CBD argues that even if the claim is moot, we should exercise our discretion to rule on the merits because the public interest exception to mootness applies. We agree with the Department that the claim is moot; however, we agree with CBD that the public interest exception to mootness applies.

An issue is moot if the matter is "purely academic" such that the court cannot provide effective relief. *City of Sequim v. Malkasian*, 157 Wn.2d 251, 258, 138 P.3d 943 (2006)). Mootness, like other questions of justiciability, is a question of law reviewed de novo. *Hilltop Terrace Homeowner's Ass'n v. Island County*, 126 Wn.2d 22, 29, 891 P.2d 29 (1995).

The challenged documents have been replaced, so the claim is moot. However, this court applies the principle of mootness with some flexibility, and if the matter is one of significant public

---

[24] The Department also states that it "plans to engage in a rulemaking process to consider amendments to WAC 220-440- 210, contingent on limited agency resources." Supp. Br. of Resp't at 7. It gives no further detail about this plan.

interest, courts may review a rule even if it is moot. *Sudar v. Dep't of Fish & Wildlife Comm'n*, 187 Wn. App. 22, 35, 347 P.3d 1090 (2015).

An appellate court, at its discretion, may "retain and decide an appeal which has otherwise become moot when it can be said that matters of continuing and substantial public interest are involved." *Sorenson v. City of Bellingham*, 80 Wn.2d 547, 558, 496 P.2d 512 (1972); *see also Hart v. Dep't of Soc. & Health Servs.*, 111 Wn.2d 445, 447, 759 P.2d 1206 (1988). Three factors in particular are determinative: "(1) whether the issue is of a public or private nature; (2) whether an authoritative determination is desirable to provide future guidance to public officers; and (3) whether the issue is likely to recur." *Hart*, 111 Wn.2d at 448. "This exception to the general rule obtains only where the real merits of the controversy are unsettled and a continuing question of great public importance exists." *Sorenson,* 80 Wn.2d at 558.

Although the program governs the hunting of bears to protect privately owned resources on private lands, the issue here is primarily public. The issue raises concerns of a public nature because it involves the management of the state's wildlife, which the state holds in trust for the benefit all residents. *State v. Longshore*, 97 Wn. App. 144, 150, 982 P.2d 1191 (1999); *Graves v. Dunlap*, 87 Wash. 648, 651, 152 P. 532 (1915). Also, through the initiative process, the public has shown an interest in the specific methods that the Department permits hunters to employ in managing the wildlife at issue here.

An appellate decision would provide guidance to public officers and agencies by clarifying which agency decisions must be subject to notice and comment rulemaking. The issue of whether these documents constitute rulemaking is also likely to recur, as demonstrated by the fact that the Department updated the same documents in 2017, 2018 and in 2020. In fact, the 2020 amendments show that the issue has already recurred.

Although the documents have changed, those changes are not significant. We do not rule on this issue substantively, but these documents supplement the statute and rules to establish conditions of permits that may subject the permittee to sanction or criminal charges. It is clearly an issue of ongoing concern and the Department has shown that it will continue to amend and use the documents. The public interest exception applies.

However, the Department did not address the merits of the claim, and respondent intervenor only devotes a few paragraphs to the subject. We remand to the trial court to give the parties the opportunity to fully and fairly litigate the issue, and to give the court the opportunity to supplement the record if warranted.

## ATTORNEY FEES

CBD argues that we should award reasonable attorney fees pursuant to RAP 18.1 under the Equal Access to Justice Act, RCW 4.84.350. It also requests that we award it costs on appeal under RAP 14.2.

Under RAP 18.1 we may award reasonable attorney fees to the prevailing party on appeal if allowed under applicable law. Under RAP 14.2, "[a] commissioner or clerk of the appellate court will award costs to the party that substantially prevails on review."

The "Equal Access to Justice Act" (EAJA) requires a court to "award a qualified party that prevails in a judicial review of an agency action fees and other expenses, including reasonable attorneys' fees, unless the court finds that the agency action was substantially justified or that circumstances make an award unjust." RCW 4.84.350(1). A nonprofit organization is a qualified party under the EAJA.[25] RCW 4.84.340(5).

---

[25] "Qualified party" means in part "[A]n organization described in section 501(c)(3) of the federal internal revenue code of 1954 as exempt from taxation." RCW 4.84.340(5).

A party is considered to have prevailed if that party obtains relief on a "significant issue." *Citizens for Fair Share v. Dep't of Corrs.*, 117 Wn. App. 411, 436, 72 P.3d 206 (2003). "'Substantially justified means justified to a degree that would satisfy a reasonable person.'" *Silverstreak, Inc. v. Dep't of Labor & Indus.*, 159 Wn.2d 868, 892, 154 P.3d 891 (2007) (quoting *Moen v. Spokane City Police Dep't*, 110 Wn. App. 714, 721, 42 P.3d 456 (2002)).

Because CBD is a qualified party[26] that prevailed on review of an agency action it is entitled to an award of reasonable attorney fees and expenses under the EAJA and costs under RAP 14.2.

We reverse and conclude that the timber hunting rule is invalid and remand the arbitrary and capricious and unlawful rulemaking claims for consideration by the trial court.

_____
Melnick, J.

We concur:

_____
Worswick, P.J.

_____
Cruser, J.

---

[26] CBD is a 501(c)(3) nonprofit organization.